47 F.3d 642
 63 USLW 2538
 AMERICAN LIFE LEAGUE, INCORPORATED; David G.P. Englefield;
Patricia Lohman; Gerald Weymes, Reverend;
Antoinette C. Cleary; Patricia Savino,
Plaintiffs-Appellants,
v.
Janet RENO; National Abortion Federation; Commonwealth
Women's Clinic; Capitol Women's Center, Incorporated;
George Tiller, Doctor; Susan Wicklund, Doctor; National
Organization for Women, Defendants-Appellees.
American Civil Liberties Union; ACLU Foundation of
Virginia, Amici Curiae.
 No. 94-1869.
 United States Court of Appeals,
Fourth Circuit.
 Argued Nov. 3, 1994.
Decided Feb. 13, 1995.
 
 ARGUED: Marion Edwyn Harrison, Law Office Marion Edwyn Harrison, Falls Church, VA, for appellants. Mark I. Levy, Civ. Div., U.S. Dept. of Justice, Washington, DC; Deborah A. Ellis, NOW Legal Defense and Educ. Fund, New York City, for appellees. ON BRIEF: John Baker, Jr., Grover Joseph Rees, Daniel M. Redmond, Law Offices Marion Edwyn Harrison, Falls Church, VA, for appellants. Frank W. Hunger, Asst. Atty. Gen., Helen F. Fahey, U.S. Atty., Mark B. Stern, Jonathan R. Siegel, Civ. Div., Deval L. Patrick, Asst. Atty. Gen., William R. Yeomans, Counsel to the Asst. Atty. Gen. Civ. Rights Div., U.S. Dept. of Justice, Washington, DC; Martha F. Davis, NOW Legal Defense and Educ. Fund; Catherine Albisa, Center for Reproductive Law & Policy, New York City, for appellees. Catherine Weiss, Louise Melling, Karen Leiter, Reproductive Freedom Project, Steven R. Shapiro, American Civ. Liberties Union Foundation, New York City, Stephen B. Pershing, American Civ. Liberties Union Foundation of Virginia, Richmond, VA, for amici curiae.
 Before HALL and MICHAEL, Circuit Judges, and CHAPMAN, Senior Circuit Judge.
 Affirmed by published opinion. Judge MICHAEL wrote the opinion, in which Judge HALL and Senior Judge CHAPMAN joined.
 OPINION
 MICHAEL, Circuit Judge:
 
 
 1
 Plaintiffs, the American Life League, Inc. and five individuals, all actively opposed to abortion, appeal from a judgment upholding the validity of the Freedom of Access to Clinic Entrances Act of 1994 (the Access Act or Act), Pub.L. No. 103-259, 108 Stat. 694 (1994) (to be codified at 18 U.S.C. Sec. 248). We affirm.
 
 
 2
 In affirming we first conclude that the Access Act is within the commerce power of Congress and that congressional action here was not barred by principles of federalism. Second, we decide that the Act does not violate the First Amendment's Free Speech Clause. The Act targets unprotected activities, such as violence and clinic blockades. However, to the extent that the Act might incidentally proscribe some conduct with expressive elements (such as peaceful but obstructive picketing), we examine it under the First Amendment. Because we find that the Act is content and viewpoint neutral, we subject it to intermediate scrutiny. Under that level of scrutiny we conclude that the Act serves substantial government interests, that it is not aimed at expression, and that it is narrowly tailored. We also conclude that the Act is neither overbroad nor vague. The Act's liquidated damages provision also withstands the First Amendment challenge. Third, we conclude that the Act does not violate the First Amendment's Free Exercise Clause or the Religious Freedom Restoration Act (RFRA), 42 U.S.C. Secs. 2000bb to 2000bb-4.
 
 I.
 
 3
 On May 26, 1994, the same day the President signed the Access Act into law, plaintiffs filed this action to challenge it in the United States District Court for the Eastern District of Virginia.
 
 
 4
 Plaintiffs allege the following in their second amended complaint. Plaintiff American Life League, Inc. (ALL) conducts educational and legislative activities "relating to the human rights of persons born and unborn." The five individual plaintiffs, Antoinette C. Cleary, David G.P. Englefield, Patricia Lohman, Patricia Savino and the Reverend Gerald Weymes, all oppose abortion "upon theological, moral and other grounds." The Reverend Mr. Weymes has often prayed near clinics that perform abortions. The other individual plaintiffs and some ALL members have "demonstrated, prayed and sidewalk-counseled within the vicinity of abortion clinics." Plaintiffs' activities have been peaceable, and they do not condone "nonpeaceable or violent conduct." Their actions, however, have physically obstructed access to abortion clinics.
 
 
 5
 Plaintiffs also allege that their continuing anti-abortion activities put them in jeopardy of violating the Access Act. They claim that the Act, by outlawing their activities, violates the Constitution and RFRA.
 
 
 6
 Plaintiffs brought this action against Janet Reno, Attorney General of the United States. The district court allowed five additional defendants to intervene: the National Abortion Federation; the National Organization for Women; Commonwealth Women's Clinic and Capitol Women's Center, two reproductive health clinics that provide counseling, birth control advice, contraceptives, medicine, pre-natal care and abortions; and Dr. George Tiller and Dr. Susan Wickland, two physicians who perform abortions. The district court accepted (as did we) an amicus brief from the American Civil Liberties Union and the ACLU Foundation of Virginia.
 
 
 7
 On June 1, 1994, five days after the complaint was filed, the Attorney General filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). The district court acted with dispatch, holding a hearing on June 10, 1994, and issuing an opinion and order dismissing the second amended complaint with prejudice on June 16, 1994. See American Life League, Inc. v. Reno, 855 F.Supp. 137 (E.D.Va.1994). Plaintiffs now appeal that order.
 
 II.
 
 8
 Congress passed the Access Act in response to protracted and nationwide violence and access obstruction at facilities providing abortions. Between 1977 and early 1993, more than 1,000 acts of violence against abortion providers and more than 6,000 clinic blockades were reported in the United States. S.Rep. 117, 103d Cong. 1st Sess. 31 (1993); H.R.Rep. No. 306, 103d Cong.2d Sess. 6-7 (1993) reprinted in 1994 U.S.C.C.A.N. 699, 703-704. "These acts included at least 36 bombings, 81 arsons, 131 death threats, 84 assaults, two kidnappings, 327 clinic invasions, and one murder." Id. Congress concluded that state and local law enforcement agencies were often unable and sometimes unwilling to protect the patients and staffs of these clinics from violence and severe disruption. S.Rep. No. 117 at 3, 18-21; H.R.Rep. No. 306 at 10, 1994 U.S.C.C.A.N. 707.
 
 
 9
 The Access Act aims to protect and promote public safety and health "by establishing Federal criminal penalties and civil remedies for certain violent, threatening, obstructive and destructive conduct that is intended to injure, intimidate or interfere with persons seeking to obtain or provide reproductive health services." Act, Sec. 2. To that end the Act provides criminal and civil penalties against anyone who:
 
 
 10
 (1) by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with or attempts to injure, intimidate or interfere with any person because that person is or has been, or in order to intimidate such person or any other person or any class of persons from, obtaining or providing reproductive health services; ... or
 
 
 11
 (3) intentionally damages or destroys the property of a facility, or attempts to do so, because such facility provides reproductive health services....
 
 Act, Sec. 3(a).[1]
 
 12
 The Access Act defines its key terms. Act, Sec. 3(e). The term "interfere with" means "to restrict a person's freedom of movement." "Intimidate" means "to place a person in reasonable apprehension of bodily harm to him- or herself or to another." "Physical obstruction" means "rendering impassable ingress to or egress from a facility that provides reproductive health services ..., or rendering passage to or from such a facility ... unreasonably difficult or hazardous." "Reproductive health services" means "reproductive health services provided in a hospital, clinic, physician's office, or other facility, and includes medical, surgical, counselling or referral services relating to the human reproductive system, including services relating to pregnancy or the termination of a pregnancy."
 
 
 13
 The Act also provides a rule of construction: "[n]othing in this section shall be construed--(1) to prohibit any expressive conduct (including peaceful picketing or other peaceful demonstration) protected from legal prohibition by the First Amendment to the Constitution." Act, Sec. 3(d).
 
 
 14
 The criminal penalties prescribed by the Act vary with the nature of the violation. For example, a first offense involving only a nonviolent physical obstruction carries a penalty of imprisonment for not more than six months or a fine of not more than $10,000. An offense resulting in death carries a penalty of imprisonment for any term of years or for life. Act, Sec. 3(b).
 
 
 15
 The civil remedies prescribed by the Act include injunctive relief, compensatory or statutory damages ($5,000 per violation), punitive damages, and costs and fees. Act, Sec. 3(c). These civil remedies are available to any person injured in providing or obtaining services at a reproductive health facility. Finally, the Act also authorizes civil actions by the Attorney General of the United States or any State Attorney General. Id.
 
 
 16
 We turn now to plaintiffs' several challenges to the Act.
 
 III.
 A.
 
 17
 As a threshold matter plaintiffs argue that Congress lacks the power to pass the Access Act. The Act identifies the Commerce Clause and section 5 of the Fourteenth Amendment as the sources of congressional power in this instance. Act, Sec. 2. We conclude that the commerce power permits Congress to regulate activities affecting reproductive health services. As a result, we need not reach plaintiffs' argument that section 5 of the Fourteenth Amendment does not provide Congress with authority.
 
 
 18
 A federal statute is valid under the Commerce Clause if Congress (1) rationally concluded that the regulated activity affects interstate commerce and (2) chose a regulatory means reasonably adapted to a permissible end. Hodel v. Virginia Surface Mining & Recl. Ass'n, 452 U.S. 264, 276, 101 S.Ct. 2352, 2360, 69 L.Ed.2d 1 (1981).
 
 
 19
 Based on an extensive legislative record, Congress rationally concluded that violence, threats of force, and physical obstructions aimed at persons seeking or providing reproductive health services affect interstate commerce. Congress marshaled, among others, the following facts to establish the interstate connection. Many women travel across state lines to seek reproductive health care. S.Rep. 117, 103d Cong. 1st Sess. 31 (1993); H.R.Conf.Rep. No. 488, 103d Cong.2d Sess. 7 (1994) reprinted in 1994 U.S.C.C.A.N. 724. Reproductive health facilities engage doctors and other staff in an interstate market. For example, Dr. David Gunn, who was murdered in Florida in 1993, performed abortions in several states. S.Rep. No. 117 at 3; H.R.Rep. No. 306, 103d Cong.2d Sess. 6-7 (1993) reprinted in 1994 U.S.C.C.A.N. 699, 704. These facilities buy medical and office supplies that move in interstate commerce. S.Rep. No. 117 at 3; H.R.Conf.Rep. No. 488 at 7. "[C]linics have been closed because of blockades and sabotage and have been rendered unable to provide services." S.Rep. No. 117 at 31. From these facts Congress concluded that interstate commerce was threatened. S.Rep. No. 117 at 31; H.R.Rep. No. 306 at 8-9, 1994 U.S.C.C.A.N. 705-706.
 
 
 20
 Congress also chose regulatory means reasonably adapted to permissible ends. The Act's criminal and civil penalties are designed to deter violent, obstructive and destructive conduct. The penalties are reasonably adapted to the Act's following permissible ends: (1) protecting the free flow of goods and services in commerce, (2) protecting patients in their use of the lawful services of reproductive health facilities, (3) protecting women when they exercise their constitutional right to choose an abortion, (4) protecting the safety of reproductive health care providers, and (5) protecting reproductive health care facilities from physical destruction and damage.
 
 
 21
 Together, these findings, these means and these objectives are more than ample to justify Congress's invocation of the commerce power. See Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964); Katzenbach v. McClung, 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964).
 
 B.
 
 22
 In a final, brief subpoint under their argument that "there is no constitutional authority for [the Access Act]," plaintiffs urge us to reject the Act as an unwarranted "incursion upon federalism and the federal judiciary." Brief for Appellants at 39, 44. First, plaintiffs suggest that any public safety problems at reproductive health facilities should be handled under existing state laws. Second, they express concern that the Access Act gives federal courts "undue jurisdiction" and will add a flood of new cases to already crowded federal dockets. We must reject these arguments. Congress, not the courts, determines the need for new federal laws. And Congress, subject only to Article III of the Constitution, establishes the jurisdiction of the inferior federal courts. See, e.g., Kline v. Burke Constr. Co., 260 U.S. 226, 233-34, 43 S.Ct. 79, 82-83, 67 L.Ed. 226 (1922); Sheldon v. Sill, 49 U.S. (8 How.) 441, 448, 12 L.Ed. 1147 (1850).
 
 IV.
 A.
 
 23
 The Constitution ordains that "Congress shall make no law ... abridging the freedom of speech." U.S. Const. amend. I. Plaintiffs claim that the Access Act abridges this freedom.
 
 
 24
 We begin our consideration of plaintiffs' freedom of speech claims by repeating the elements of a basic offense under the Act. A violator must (1) "by force or threat of force or by physical obstruction," (2) "intentionally injure[ ], intimidate[ ], or interfere[ ] ... with any person," (3) "because that person [the victim] is ... obtaining or providing reproductive health services." Act, Sec. 3(a).
 
 
 25
 The government's first defense is that the Act does not implicate the First Amendment at all; rather, it regulates conduct that is outside the First Amendment. According to the government, the Act leaves plaintiffs free to engage in any form of protected speech they choose.
 
 
 26
 In many respects the government is correct. The Access Act does not prohibit protestors from praying, chanting, counseling, carrying signs, distributing handbills or otherwise expressing opposition to abortion, so long as these activities are carried out in a non-violent, non-obstructive manner. What the Act does prohibit is force, the threat of force and physical obstruction intended to deprive someone of the lawful right to use or provide reproductive health services.
 
 
 27
 The use of force or violence is outside the scope of First Amendment protection. Wisconsin v. Mitchell, --- U.S. ----, ----, 113 S.Ct. 2194, 2199, 124 L.Ed.2d 436 (1993) ("a physical assault is not by any stretch of the imagination expressive conduct protected by the First Amendment"). True threats of force also lie outside the First Amendment. Watts v. United States, 394 U.S. 705, 707, 89 S.Ct. 1399, 1401, 22 L.Ed.2d 664 (1969) (holding that "[w]hat is a threat must be distinguished from what is constitutionally protected speech"); see R.A.V. v. City of St. Paul, --- U.S. ----, ---- - ----, 112 S.Ct. 2538, 2546-47, 120 L.Ed.2d 305 (1992). Finally, certain physical obstructions, such as a blockade of pedestrian traffic, are not protected by the First Amendment. See Cameron v. Johnson, 390 U.S. 611, 617, 88 S.Ct. 1335, 1339, 20 L.Ed.2d 182 (1968) (holding that a statute which prohibited unreasonable interference with access to a courthouse was a "valid law ... and the fact that free speech is intermingled with such conduct does not bring with it constitutional protection").
 
 
 28
 Thus, the Act does target unprotected activities. But the Act cannot escape First Amendment scrutiny entirely. The Act might incidentally affect some conduct with protected expressive elements, such as peaceful but obstructive picketing. The right to peaceful protest lies near the heart of the freedom of speech. Accordingly, we examine the Act under the First Amendment.
 
 B.
 
 29
 The first step in our First Amendment inquiry is to determine whether the Act is content and viewpoint neutral. Plaintiffs argue that the Act is a content- or viewpoint-based restriction because it outlaws conduct for its anti-abortion message. If plaintiffs are correct, then we subject the Act to strict scrutiny. To pass this test a law must be necessary to serve compelling governmental interests by the least restrictive means available. See, e.g., R.A.V., --- U.S. at ---- - ----, 112 S.Ct. at 2549-50; Burson v. Freeman, --- U.S. ----, ----, 112 S.Ct. 1846, 1851, 119 L.Ed.2d 5 (1992) (plurality). If plaintiffs are incorrect, if the Act is content and viewpoint neutral, then we subject it to intermediate scrutiny. To pass this test a law must be narrowly tailored to serve substantial governmental interests. See, e.g., Ward v. Rock Against Racism, 491 U.S. 781, 791, 109 S.Ct. 2746, 2754, 105 L.Ed.2d 661 (1989); Clark v. Community for Creative Non-Violence, 468 U.S. 288, 293, 104 S.Ct. 3065, 3069-69, 82 L.Ed.2d 221 (1984).
 
 
 30
 The neutrality inquiry does not focus on the motive of the violator. Rather, a statute regulating expressive conduct is neutral if it is justified without reference to the content of the violator's message or point of view. Madsen v. Women's Health Center, Inc., --- U.S. ----, ---- - ----, 114 S.Ct. 2516, 2523-24, 129 L.Ed.2d 593 (1994); Ward, 491 U.S. at 791, 109 S.Ct. at 2754. Congress's purpose is the main consideration. Id.
 
 
 31
 The Access Act identifies its purpose in plain language:
 
 
 32
 the purpose of this Act [is] to protect and promote public safety and health and activities affecting interstate commerce by establishing Federal criminal penalties and civil remedies for certain violent, threatening, obstructive and destructive conduct that is intended to injure, intimidate, or interfere with persons seeking to obtain or provide reproductive health services.
 
 
 33
 Act, Sec. 2. The Act also includes rules of construction:
 
 
 34
 Nothing in this section shall be construed--
 
 
 35
 (1) to prohibit any expressive conduct (including peaceful picketing or other peaceful demonstration) protected from legal prohibition by the First Amendment to the Constitution;
 
 
 36
 (2) to create any new remedies for interference with activities protected by the free speech or free exercise clauses of the First Amendment to the Constitution, occurring outside a facility, regardless of the point of view expressed....
 
 
 37
 Act, Sec. 3(d). Together, the Act's statement of purpose and rules of construction indicate that the Act was not passed to outlaw conduct because it expresses an idea. Instead, Congress passed the Act to promote public safety and health and to protect interstate commerce from disruption.
 
 
 38
 Plaintiffs insist that these lofty statements of purpose and construction are subterfuge. They say Congress really intended to "suppress only the anti-abortion side of a fierce national debate." Brief for Appellants at 8. This argument ignores the Act's substantive provisions. These unambiguous provisions do not target any message based on content or viewpoint.
 
 
 39
 The Act protects reproductive health services and those who use and provide them. Reproductive health services embrace "medical, surgical, counseling, or referral services relating to the human reproductive system." Act, Sec. 3(e). The Act thus protects access to all reproductive health services, including both abortion and services connected with carrying a fetus to term. It applies, for example, to facilities opposing abortion and to facilities offering pregnant women counseling about alternatives to abortion. For example, AAA Women for Choice, Inc., a facility run by plaintiff Patricia Lohman, would be protected. AAA Women for Choice offers "counsel, comfort and alternatives other than abortion to pregnant women." Second Amended Complaint at p 6.
 
 
 40
 Moreover, the Act punishes anyone who engages in the prohibited conduct. For example, anyone who, with the requisite intent, blocks a person from entering a facility to obtain or provide reproductive health services violates the Act. The viewpoint of the obstructer is irrelevant. The Act forbids the obstructive conduct not because of the content of any message that conduct might convey, but because of its harmful effects.
 
 
 41
 Plaintiffs press on and say that the Act's apparent neutrality is not enough. They charge that the inclusion of protection for anti-abortion services is a ruse to make the Act look neutral. In reality, they argue, the Act aims to suppress the anti-abortion movement. They note that one is a wrongdoer under the Act only when he commits the proscribed conduct because the victim is obtaining or providing reproductive health services. The "because" element is the Act's Achilles's heel, according to plaintiffs. They say only people who oppose abortion will be punished under the Act; those who protest at reproductive health facilities for reasons unrelated to the abortion issue will never violate the law. As examples, plaintiffs say those protesting at clinics on labor and environmental issues would not violate the Act. On this basis plaintiffs conclude that the Act is aimed at their motives for protesting and thus at their message and its viewpoint.
 
 
 42
 This lack-of-neutrality argument overlooks the distinction between what the Act does and does not regulate. Again, the Act does not prohibit peaceful protestors from praying, chanting, counseling, carrying signs, distributing handbills, or otherwise expressing their opposition to abortion. What the Act does prohibit is force, the threat of force, and physical obstruction, when carried out because a person is using or providing reproductive health services. The "because" or motive element does not render the Act content or viewpoint based. As we explain below, the Act's motive requirement simply narrows its reach, and this narrowing is within congressional prerogative.
 
 
 43
 In Wisconsin v. Mitchell, --- U.S. ----, 113 S.Ct. 2194, 124 L.Ed.2d 436 (1993), the Supreme Court upheld a Wisconsin law that enhanced the sentence for the crime of aggravated battery when the defendant intentionally selected his victim because of the victim's race. Just like plaintiffs here, the defendant argued that he was being punished for his motive for acting. The unanimous Supreme Court rejected that argument, saying "[m]otive plays the same role under the Wisconsin statute as it does under the federal and state anti-discrimination laws, which we have previously upheld against constitutional challenge." Id. at ----, 113 S.Ct. at 2200. The Court reasoned that "the penalty-enhancement statute [was] aimed at conduct unprotected by the First Amendment." Id. at ----, 113 S.Ct. at 2201. Thus, Wisconsin's statute did not target conduct on the basis of its expressive elements. Mitchell 's conclusion was consistent with the Supreme Court's prior recognition that "where government does not target conduct on the basis of its expressive content, acts are not shielded from regulation merely because they express a discriminatory idea or philosophy." R.A.V. v. City of St. Paul, --- U.S. ----, ---- - ----, 112 S.Ct. 2538, 2546-47, 120 L.Ed.2d 305 (1992).
 
 
 44
 As the Supreme Court observed in both Mitchell and R.A.V., the distinction between targeting the expressive elements of conduct and targeting the proscribable elements of conduct undergirds many federal laws. For example, Title VII includes a motive requirement. Title VII makes it unlawful for an employer to discriminate against an employee "because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. Sec. 2000e-2(a)(1) (emphasis added). The Supreme Court has held that Title VII does not infringe an employer's First Amendment rights. Hishon v. King & Spalding, 467 U.S. 69, 78, 104 S.Ct. 2229, 2235, 81 L.Ed.2d 59 (1984). Another example is a provision in the Fair Housing Act that prohibits using force or the threat of force to injure, intimidate, or interfere with a person "because " he is participating in certain housing programs. 42 U.S.C. Sec. 3631 (emphasis added). That provision, despite its motive requirement, has been upheld as a content- and viewpoint-neutral regulation. United States v. Hayward, 6 F.3d 1241, 1249-51 (7th Cir.1993), cert. denied, --- U.S. ----, 114 S.Ct. 1369, 128 L.Ed.2d 46 (1994); United States v. Gilbert, 813 F.2d 1523, 1529-31 (9th Cir.), cert. denied, 484 U.S. 860, 108 S.Ct. 173, 98 L.Ed.2d 127 (1987).[2]
 
 
 45
 Thus, Congress may enact laws to punish proscribable conduct even though the conduct is motivated by certain biases or beliefs. More important for this case, Congress can exercise its prerogative to single out and address "conduct thought to inflict greater individual and societal harm" by using a motive requirement to narrow the reach of a law. Mitchell, --- U.S. at ----, 113 S.Ct. at 2201; see FCC v. Beach Communications, Inc., --- U.S. ----, ---- - ----, 113 S.Ct. 2096, 2102-03, 124 L.Ed.2d 211 (1993). Indeed, in passing the Access Act Congress determined that intentional interference with access to reproductive health services is more damaging to federal interests than activity that affects such access only incidentally, e.g., labor or environmental protesting. We repeat, Congress may choose to legislate only against actions it considers to be more serious. Moreover, a statute is not rendered non-neutral simply because one ideologically defined group is more likely to engage in the proscribed conduct. See United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) (upholding a statutory prohibition on burning draft cards despite the fact that most violators would likely oppose the Vietnam War).
 
 
 46
 For these reasons, we find that the Access Act is content and viewpoint neutral. The Act is justified without reference to the violator's viewpoint or the content of his message. Therefore, we subject the Act to intermediate scrutiny.
 
 C.
 
 47
 Intermediate scrutiny is required when a statute potentially regulates conduct that has protected expressive elements. The intermediate scrutiny test was first enunciated by the Supreme Court in O'Brien.
 
 
 48
 O'Brien was convicted under a federal statute which made it a crime to destroy a draft card knowingly. In the Supreme Court O'Brien argued that his "act of burning his [draft card] was protected 'symbolic speech' within the First Amendment." O'Brien, 391 U.S. at 376, 88 S.Ct. at 1678. The Supreme Court upheld the conviction, noting that Congress could regulate conduct that has an expressive element, given sufficient justification:
 
 
 49
 even on the assumption that the alleged communicative element in O'Brien's conduct is sufficient to bring into play the First Amendment, it does not necessarily follow that the destruction of a [draft card] is constitutionally protected activity. This Court has held that when "speech" and "nonspeech" elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms.
 
 
 50
 Id. The Court then laid down a test for reviewing a statute, such as the Access Act, that may incidentally affect speech as it regulates conduct. Under O'Brien 's test such a statute passes constitutional muster "if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." Id. at 377, 88 S.Ct. at 1679.
 
 1.
 
 51
 O'Brien 's first prong asks whether the Act furthers important or substantial government interests. For easier discussion we group the several interests suggested by the government.
 
 
 52
 One group relates to protecting public health, safety and commerce. This interest includes protecting patients and staff from violence and harm and protecting reproductive health facilities from physical destruction or damage. It also includes protecting interstate patient traffic and the interstate market for the services of doctors, nurses, counselors, and other staff.
 
 
 53
 A second group of interests relates to protecting women and men from violence and threats in the exercise of their rights. The Supreme Court has recognized that government "has a strong interest in protecting a woman's freedom to seek lawful medical or counseling services in connection with her pregnancy." Madsen v. Women's Health Center, Inc., --- U.S. ----, ----, 114 S.Ct. 2516, 2526, 129 L.Ed.2d 593 (1994). This freedom includes the constitutional right to terminate a pregnancy. See Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); Planned Parenthood v. Casey, --- U.S. ----, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). Also, both women and men have the constitutional right to obtain and use contraceptives. See Eisenstadt v. Baird, 405 U.S. 438, 440, 446, 92 S.Ct. 1029, 1031-32, 1034-35, 31 L.Ed.2d 349 (1972); Casey, --- U.S. at ----, 112 S.Ct. at 2807. They should be able to use reproductive health facilities to exercise this right.
 
 
 54
 Together, or separately, these interests are significant. The government has a substantial interest in acting to protect them, as Congress did by passing the Access Act.
 
 2.
 
 55
 O'Brien next asks whether the government's interests relate to suppressing free expression. This analysis is essentially the same as the content- and viewpoint-neutrality test we applied earlier. See IV.B., supra. We concluded that the Act was justified without reference to the message or viewpoint of anyone who might violate it. Relying on the Act's plain language, we also noted that its purpose was not related to suppressing expression. Instead, we found that the Act outlawed certain actions because of their harmful effects. We next rejected plaintiffs' contention that the Act's avowed purpose shrouded an illicit purpose. We believe this analysis is sufficient for the Act to pass the second prong of the O'Brien test.[3]
 
 3.
 
 56
 Under O'Brien 's third prong we consider whether the incidental restriction on alleged First Amendment freedoms is no greater than required to meet the government's interests. This has been interpreted as a requirement for "narrow tailoring." Ward v. Rock Against Racism, 491 U.S. 781, 799, 109 S.Ct. 2746, 2758, 105 L.Ed.2d 661 (1989). The statute must not "burden substantially more speech than is necessary to further the government's legitimate interests." Id.
 
 
 57
 The Act meets this standard. Much of the conduct (force and violence) outlawed under the Act lacks any protected expressive element at all. Of course, peaceful but obstructive protesting, which plaintiffs argue has expressive elements, could run afoul of the Act. For example, protesters blocking a clinic door as they pray might violate the Act's prohibition on physical obstruction. However, such a violation would be simply a consequence of the government's lawful aim to protect access to reproductive health services. And the Act proscribes no more expressive conduct than necessary to protect safe and reliable access to reproductive health services. After all, the Act leaves open ample alternative means for communication. In a non-violent, non-obstructive manner, protestors may still stand outside reproductive health facilities and express their anti-abortion message. They may still proclaim their views and make their pleas by voice, signs, handbills, symbolic gestures and other expressive means.[4]
 
 4.
 
 58
 In sum, the Access Act serves substantial government interests such as preventing violence, preserving public access to reproductive health services, and protecting citizens in their exercise of constitutional rights. It is not aimed at expression, and it is narrowly tailored. It passes O'Brien 's test.
 
 D.
 
 59
 Plaintiffs next assert that the Act is unconstitutionally overbroad and vague. They claim that "[t]housands of persons who daily engage in peaceful activities around abortion clinics now risk arrest [and] prosecution" for exercising their First Amendment rights. Brief for Appellants at 29. They specifically point to "sign-carrying ... and rosary-carrying processions outside clinics." Id. at 28. Plaintiffs' argument is this: the Act's alleged overbreadth and vagueness will have a "chilling effect" on such activities.
 
 
 60
 As for overbreadth, "[o]nly a statute that is substantially overbroad may be invalidated on its face." Houston v. Hill, 482 U.S. 451, 458, 107 S.Ct. 2502, 2508, 96 L.Ed.2d 398 (1987) (citations omitted). Such an invalid statute proscribes so much protected speech that it must be struck down entirely. Accordingly, the overbreadth doctrine is "strong medicine" to be applied "sparingly and only as a last resort." Broadrick v. Oklahoma, 413 U.S. 601, 613, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973). Even though the Act might be applied to some protected expression, such as peaceful picketing, that picketing would be prohibited only in the most narrow and justifiable circumstances. Under the Act, "physical obstruction" involves intentionally "rendering impassable ingress to or egress from a facility ... or rendering passage to or from such a facility ... unreasonably difficult or hazardous." Act, Sec. 3(e)(4). Thus, it is difficult to see how the Act is substantially overbroad in relation to its legitimate scope of outlawing violence and barriers to access.
 
 
 61
 The vagueness doctrine is concerned with clarity. A statute is unconstitutionally vague if it does not give a "person of ordinary intelligence a reasonable opportunity to know what is prohibited...." Grayned v. City of Rockford, 408 U.S. 104, 108, 92 S.Ct. 2294, 2298-99, 33 L.Ed.2d 222 (1972). The vagueness doctrine protects both free speech and due process values.
 
 
 62
 The Access Act's anti-obstruction provisions closely resemble a statute the Supreme Court upheld against a vagueness challenge in Cameron v. Johnson, 390 U.S. 611, 88 S.Ct. 1335, 20 L.Ed.2d 182 (1968). In Cameron arrested civil rights protestors challenged Mississippi's Anti-Picketing Law, which provided:
 
 
 63
 1. It shall be unlawful for any person, singly or in concert with others, to engage in picketing or mass demonstrations in such a manner as to obstruct or unreasonably interfere with free ingress or egress to and from any public premises....
 
 
 64
 Id. at 613, 88 S.Ct. at 1336. The Supreme Court rejected the vagueness challenge on the grounds that the terms "obstruct," "unreasonably" and "interfere with" were perfectly clear, widely used, and well understood. According to the Court, the statute "precisely delineates its reach in words of common understanding." Id. at 616, 88 S.Ct. at 1338.
 
 
 65
 Like the Anti-Picketing Law upheld in Cameron, the Act here speaks in clear, common words. Moreover, the Act goes beyond the statute in Cameron by defining many of its terms. The Act defines "interfere with" to mean "restrict a person's freedom of movement." Act, Sec. 3(e)(2). It defines "intimidate" to mean "place a person in reasonable apprehension of bodily harm...." Act, Sec. 3(e)(3). These and other narrowing definitions in the Act should inform those opposed to abortion that they will not offend this law by peaceful, non-obstructive picketing.
 
 
 66
 We conclude that the Access Act is neither overbroad nor vague.
 
 E.
 
 67
 Plaintiffs' final freedom of expression challenge to the Access Act concerns a civil damage provision. The Act authorizes injured persons to file private actions, and it permits them to elect to recover $5,000 per violation in lieu of actual damages. Act, Sec. 3(c). Plaintiffs claim that this damage provision is unconstitutional under NAACP v. Claiborne Hardware Co., 458 U.S. 886, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982).
 
 
 68
 Specifically, plaintiffs say that under Claiborne Hardware only actual damages caused by unprotected conduct may be recovered. But that is not what Claiborne Hardware says. Claiborne Hardware involved a money judgment imposing joint and several liability against ninety-two participants in a mass boycott of white-owned businesses. The Supreme Court addressed whether all members of the group could be held liable for the violent acts of a few. "Civil liability may not be imposed merely because an individual belonged to a group," the Court said. Id. at 920, 102 S.Ct. at 3429. The Court did not consider what the constitutional measure of damages might be after a defendant was found liable for an unprotected act.
 
 
 69
 The Act here does not subject anyone to damages caused by protected expression. It does subject violators to limited liquidated damages for unprotected conduct. We know of no rule prohibiting a liquidated damages provision that may in a particular case impose more than actual damages for unprotected activity.[5]
 
 V.
 
 70
 Plaintiffs' last claims concern protections afforded religion. Specifically, they argue that the Access Act offends the First Amendment's Free Exercise Clause and the Religious Freedom Restoration Act of 1993 (RFRA), 42 U.S.C. Secs. 2000bb to 2000bb-4.
 
 A.
 
 71
 The Free Exercise Clause provides that "Congress shall make no law ... prohibiting the free exercise" of religion. U.S. Const. amend. I. The clause forbids government from adopting laws designed to suppress religious belief or practice. Church of Lukumi Babalu Aye, Inc. v. Hialeah, --- U.S. ----, ----, 113 S.Ct. 2217, 2222, 124 L.Ed.2d 472 (1993). However, a neutral, generally applicable law does not offend the Free Exercise Clause, even if the law has an incidental effect on religious practice. Employment Div., Dept. of Human Resources v. Smith, 494 U.S. 872, 878-79, 110 S.Ct. 1595, 1600, 108 L.Ed.2d 876 (1990).
 
 
 72
 Relying on Church of Lukumi Babalu Aye, plaintiffs claim that the Access Act violates the Free Exercise Clause. They say it aims to restrict nonviolent protest because of the protestors' religious motivation. In Church of Lukumi Babalu Aye the Supreme Court examined city ordinances aimed at suppressing the Santeria religion. The ordinances prohibited ritual animal slaughter, a Santeria religious practice. The ordinances carefully outlawed only animal sacrifice and the possession of animals for sacrificial purposes. They did not outlaw hunting, fishing, or the killing of animals for food. In short, the ordinances accomplished a religious gerrymander. They singled out religious practices for discriminatory treatment. The Supreme Court subjected the ordinances to the same level of exacting (strict) scrutiny it applies to content-based restrictions on speech. Church of Lukumi Babalu Aye, --- U.S. at ---- - ----, 113 S.Ct. at 2233-34. The ordinances were held unconstitutional.
 
 
 73
 By contrast, the Access Act punishes conduct for the harm it causes, not because the conduct is religiously motivated. See IV.B., supra. By necessity, then, the Act does not punish religious belief. It proscribes violent, forceful or threatening conduct without regard to expressive content or viewpoint. See IV.B., supra. Under the Act it makes no difference whether a violator acts on the basis of religious conviction or temporal views. The same conduct is outlawed for all. Therefore, the Act is a generally applicable law, neutral toward religion. It does not offend the First Amendment's Free Exercise Clause.
 
 B.
 
 74
 The Religious Freedom Restoration Act (RFRA) mandates that government shall not "substantially burden a person's exercise of religion" unless the government demonstrates that the burden furthers a "compelling governmental interest" by the "least restrictive means." 42 U.S.C. Sec. 2000bb-1.
 
 
 75
 The Access Act and RFRA were passed by the same Congress, but RFRA was passed first. RFRA's rule of construction says that federal statutes enacted after RFRA are subject to its provisions unless the later statute "explicitly excludes [RFRA's] application by reference to [the RFRA statute]." Id. at Sec. 2000bb-3(b). The Access Act does not exclude RFRA's application, so we examine plaintiffs' claim that the Access Act violates RFRA.
 
 
 76
 The threshold inquiry under RFRA concerns burden. If a statute does not substantially burden a religious practice, then the statute does not implicate RFRA.
 
 
 77
 Plaintiffs' complaint alleges that they do not "condone ... nonpeaceable or violent conduct." Accordingly, a proscription on violence and force cannot substantially burden their religious exercise. However, plaintiffs' complaint also alleges that their opposition to abortion (on religious grounds) requires them to obstruct physically, through peaceful picketing, access to clinics offering abortion services. We will assume that this allegation, coupled with plaintiffs' assertion that the Access Act violates their RFRA rights, satisfies their obligation to plead a substantial burden on their religious exercise. See Fed.R.Civ.P. 8. This requires us to move to RFRA's next level: an examination of whether the alleged substantial burden imposed by the Access Act furthers a "compelling governmental interest" by the "least restrictive means" available.
 
 
 78
 We begin with some background. Congress passed RFRA as a response to Employment Div., Dep't of Human Resources v. Smith, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). The "findings" section of RFRA states that Smith "virtually eliminated the requirement that government justify burdens on religious exercise imposed by laws neutral toward religion." 42 U.S.C. Sec. 2000bb(a). The "purpose" section adds that RFRA aims "to restore the compelling interest test as set forth in Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), and Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972)." Id. at Sec. 2000bb(b).[6]
 
 
 79
 In Sherbert South Carolina denied unemployment benefits to a Seventh-day Adventist fired for refusing to work on her Sabbath. The Supreme Court reversed. It found uncompelling South Carolina's asserted interest in deterring "unscrupulous claimants feigning religious objections to Saturday work." Sherbert, 374 U.S. at 407, 83 S.Ct. at 1795. In Yoder Wisconsin convicted three Amish parents for refusing to send their children to school beyond the eighth grade. Wisconsin's highest court reversed the convictions, and that result stood in the United States Supreme Court. Wisconsin's asserted interest of preparing self-reliant citizens for participation in society was rejected as uncompelling by the Supreme Court. The Amish had introduced convincing evidence that accommodating their religious objections by excusing a year or two of compulsory schooling would not impair the physical or mental health of the children or undermine their ability to be self-supporting and good citizens. Yoder, 406 U.S. at 221-29, 92 S.Ct. at 1536-40. In both Sherbert and Yoder the Supreme Court carefully distinguished cases involving the government's paramount interest in protecting physical or mental health, public safety, or public welfare. Sherbert, 374 U.S. at 403, 83 S.Ct. at 1793; Yoder, 406 U.S. at 230, 92 S.Ct. at 1540. In addition, Sherbert noted that religious accommodation could be denied when the accommodation, by allowing non-uniform treatment, presented a problem of sufficient magnitude to render a statutory scheme unworkable. Sherbert, 374 U.S. at 408-09, 83 S.Ct. at 1796.
 
 
 80
 In Free Exercise Clause decisions cited by or following Sherbert, the Supreme Court has recognized these compelling governmental interests in a variety of situations. For instance, the Court found the need for uniformity paramount in a case requiring an Amish employer to pay Social Security taxes for Amish employees, United States v. Lee, 455 U.S. 252, 258-59, 102 S.Ct. 1051, 1055-56, 71 L.Ed.2d 127 (1982), and in a case denying Jewish servicemen the right to wear a yarmulke, Goldman v. Weinberger, 475 U.S. 503, 508-510, 106 S.Ct. 1310, 1313-14, 89 L.Ed.2d 478 (1986). It found public welfare paramount in a case enforcing the draft against persons who considered a particular war "unjust," Gillette v. United States, 401 U.S. 437, 462, 91 S.Ct. 828, 842, 28 L.Ed.2d 168 (1971), and in a case denying tax exemptions to educational institutions with racially discriminatory policies, Bob Jones University v. United States, 461 U.S. 574, 604, 103 S.Ct. 2017, 2035, 76 L.Ed.2d 157 (1983). The Court found the public health and safety interest decisive in upholding mandatory vaccination, Jacobson v. Massachusetts, 197 U.S. 11, 25 S.Ct. 358, 49 L.Ed. 643 (1905),[7] and in enforcing child labor laws, Prince v. Massachusetts, 321 U.S. 158, 168-70, 64 S.Ct. 438, 443-44, 88 L.Ed. 645 (1944) (finding that a state's interest in protecting health justified prohibiting a nine-year-old Jehovah's Witness from distributing religious literature).
 
 
 81
 Finally, we do not think the Free Exercise Clause shields conduct violating a criminal law that protects people and property from physical harm. Cf. Reynolds v. United States, 98 U.S. (8 Otto) 145, 166, 25 L.Ed. 244 (1878) (posing the following rhetorical question: "[s]uppose one believed that human sacrifices were a necessary part of religious worship, would it be seriously contended that the civil government under which he lived could not interfere to prevent a sacrifice?").
 
 
 82
 With this background in mind we measure the Access Act against RFRA. First, we believe the Access Act serves sufficiently compelling governmental interests. After all, the Act protects public health by promoting unobstructed access to reproductive health facilities. It also protects public safety by proscribing all violent, threatening or obstructive conduct specifically aimed at patients and providers of reproductive health services.
 
 
 83
 Second, we believe the Access Act is sufficiently narrow. The Act's prohibitions are directed only to those actions Congress found to be a national problem, specifically force, threat of force and physical obstruction. The Act does not sweep within its prohibitions activity unrelated to the serious trouble Congress sought to address.
 
 
 84
 We conclude that the Access Act serves sufficiently compelling government interests by the least restrictive means available. It therefore does not violate RFRA.
 
 VI.
 
 85
 "There are manifold restraints to which every person is necessarily subject for the common good. On any other basis organized society could not exist with safety to its members." Jacobson v. Massachusetts, 197 U.S. 11, 26, 25 S.Ct. 358, 361, 49 L.Ed. 643 (1905) (Harlan, J.). In passing the Access Act, Congress acted to ensure that violence and aggressive obstruction are not used as means of settling what has become a loud and vexing public dispute.
 
 
 86
 The Access Act strikes a balance among competing rights holders. It protects those who seek or provide reproductive health services without suppressing robust debate about abortion. Those opposed to abortion or to any other reproductive health service retain the freedom to express their deeply-held moral or religious views in a peaceful, non-obstructive way.
 
 
 87
 The district court's order dismissing the complaint is affirmed.
 
 
 88
 AFFIRMED.
 
 
 
 [1]
 The Act also prohibits the same activities if directed at (i) any person lawfully exercising or seeking to exercise the right of religious freedom at a place of religious worship or (ii) the property of a place of religious worship. Act, Sec. 3(a). Those portions of the Act are not at issue in this case
 
 
 [2]
 See also, e.g., 18 U.S.C. Sec. 245(b) (making it a crime to use "force or threat of force [to] willfully injure[ ], intimidate[ ], or interfere[ ] with ... any person because " that person is voting or working for the federal government) (emphasis added); and 42 U.S.C. Sec. 1971(b) (Voting Rights Act) (providing that no person "shall intimidate, threaten, [or] coerce ... for the purpose of interfering with" a person's right to vote) (emphasis added)
 
 
 [3]
 We add a comment here about the government's acknowledgment that "the national campaign of violent and obstructive pro-life protests was the catalyst that led to passage of the Act." Brief for Appellee United States at 22 n. 7. This acknowledgment does not mean that Congress acted to curb protected expression. Protecting reproductive health facilities, patients, and providers is a legal purpose, unrelated to suppressing free expression
 
 
 [4]
 Our conclusion that the Act is narrowly tailored is also supported by the reasoning that compels us not to apply the overbreadth doctrine. See IV.D., infra
 
 
 [5]
 The reasonableness of the amount ($5,000) of the liquidated damages per violation is not at issue here
 
 
 [6]
 RFRA contemplates that courts will rely on cases decided prior to Smith when applying the statute's compelling interest standard. See 42 U.S.C. Sec. 2000bb(a)(5) (finding that the "compelling interest test as set forth in prior Federal court rulings [prior to Smith ] is a workable test"); S.Rep. 111, 103d Cong. 1st. Sess. 8 reprinted in 1993 U.S.C.C.A.N. 1892, 1898 (noting that the "committee expects that courts will look to free exercise cases decided prior to Smith for guidance"); id. at 9 (stating that "the compelling interest generally should not be construed more stringently or more leniently than it was prior to Smith ") (footnote omitted)
 
 
 [7]
 Jacobson did not explicitly address the Free Exercise Clause. It did, however, discuss fundamental "liberty" interests. 197 U.S. at 26-27 and 38-39, 25 S.Ct. at 361-62 and 366-67. Sherbert, 374 U.S. at 403, 83 S.Ct. at 1793-94, and Yoder, 406 U.S. at 230, 92 S.Ct. at 1541, construe Jacobson as a health and safety case