126 F.3d 575
 Sharon HOFFMAN; Trudie Matthews; Diane Hoefling; Ronnie
Wallace, Reverend; John Bradley, Reverend,
Plaintiffs-Appellees,
v.
James B. HUNT, Jr., Governor; State of North Carolina,
Defendants-Appellants,
and
D.R. Stone; Charlotte-Mecklenburg Police Department;
United States of America, Defendants.
American Medical Women's Association; Feminist Majority
Foundation; Medical Students for Choice; National Abortion
and Reproductive Rights Action League; National Center for
Pro Choice Majority; National Organization for Women;
National Women's Law Center; Women's Legal Defense Fund;
American Civil Liberties Union of North Carolina Legal
Foundation, Incorporated; American Civil Liberties Union;
Planned Parenthood of the Triad, Incorporated; Planned
Parenthood of the Southern Piedmont and Carolina Mountains,
Incorporated; United States Justice Foundation; North
Carolina Family Policy Council; Focus on the Family;
Family Research Counsel; Planned Parenthood Federation of
America, Incorporated; National Abortion Federation, Amici Curiae.
Sharon HOFFMAN; Trudie Matthews; Diane Hoefling; Ronnie
Wallace, Reverend; John Bradley, Reverend,
Plaintiffs-Appellees,
v.
UNITED STATES of America, Defendant-Appellant,
and
James B. Hunt, Jr., Governor; State of North Carolina;
D.R. Stone; Charlotte-Mecklenburg Police
Department, Defendants.
Planned Parenthood Federation of America, Incorporated;
American Medical Women's Association; Feminist Majority
Foundation; Medical Students for Choice; National Abortion
and Reproductive Rights Action League; National Abortion
Federation; National Center for Pro Choice Majority;
National Organization for Women; National Women's Law
Center; South Carolina National Organization for Women;
Women's Law Project; Women's Legal Defense Fund; American
Civil Liberties Union of North Carolina Legal Foundation,
Incorporated; American Civil Liberties Union; Planned
Parenthood of the Triad, Incorporated; Planned Parenthood
of the Southern Piedmont and Carolina Mountains,
Incorporated; United States Justice Foundation; North
Carolina Family Policy Council; Focus on the Family;
Family Research Council, Amici Curiae.
Sharon HOFFMAN; Trudie Matthews; Diane Hoefling; Ronnie
Wallace, Reverend; John Bradley, Reverend,
Plaintiffs-Appellees,
v.
UNITED STATES of America, Defendant-Appellant,
and
James B. Hunt, Jr., Governor; State of North Carolina;
D.R. Stone; Charlotte-Mecklenburg Police
Department, Defendants.
Planned Parenthood Federation of America, Incorporated;
American Medical Women's Association; Feminist Majority
Foundation; Medical Students for Choice; National Abortion
and Reproductive Rights Action League; National Abortion
Federation; National Center for Pro Choice Majority;
National Organization for Women; National Women's Law
Center; South Carolina National Organization for Women;
National Women's Law Center; South Carolina National
Organization for Women; Women's Law Project; Women's Legal
Defense Fund; American Civil Liberties Union of North
Carolina Legal Foundation, Incorporated; American Civil
Liberties Union; Planned Parenthood of the Triad,
Incorporated; Planned Parenthood of the Southern Piedmont
and Carolina Mountains, Incorporated; United States Justice
Foundation; North Carolina Family Policy Council; Focus on
the Family; Family Research Council, Amici Curiae.
 Nos. 96-1581, 96-1582 and 96-1623.
 United States Court of Appeals,
Fourth Circuit.
 Argued April 9, 1997.
Decided Sept. 19, 1997.
 
 ARGUED: Stephen Woolman Preston, Deputy Assistant Attorney General, Civil Division, United States Department of Justice, Washington, DC; Alexander McClure Peters, Special Deputy Attorney General, North Carolina Department of Justice, Raleigh, NC, for Appellants. Benjamin W. Bull, The American Center for Law and Justice, Scottsdale, AZ, for Appellees. ON BRIEF: Frank W. Hunger, Assistant Attorney General, Mark T. Calloway, United States Attorney, Mark B. Stern, Sushma Soni, Civil Division, United States Department of Justice, Washington, DC, for Appellant United States. Michael F. Easley, Attorney General, Ann Reed, Senior Deputy Attorney General, North Carolina Department of Justice, Raleigh, NC, for State Appellants. Jay Alan Sekulow, Walter M. Weber, The American Center for Law and Justice, Washington, DC; Samuel A. Wilson, III, W. David Thurman, Bush, Thurman & Wilson, Charlotte, NC, for Appellees. Pamela S. Karlan, Charlottesville, VA; Roger K. Evans, Legal Action for Reproductive Rights, New York City, for Amicus Curiae Planned Parenthood Federation of America. Martha F. Davis, Yolanda S. Wu, Now Legal Defense and Education Fund, New York City; Michael Erdos, Priscilla J. Smith, Kathryn Kolbert, Center for Reproductive Law & Policy, New York City, for Amici Curiae NOW, et al. Deborah K. Ross, American Civil Liberties Union of North Carolina, Raleigh, NC; Burton Craige, Patterson, Harkavy & Lawrence, L.L.P., Raleigh, NC, for Amici Curiae American Civil Liberties Union of North Carolina Legal Foundation, et al. Diane Bodner, Swick & Shapiro, P.C., Washington, DC; Gary G. Kreep, Kevin Snider, United States Justice Foundation, Escondido, CA, for Amicus Curiae United States Justice Foundation. Jordan W. Lorence, Fairfax, VA, for Amici Curiae North Carolina Family Policy Council, et al.
 Before RUSSELL, WILKINS, and WILLIAMS, Circuit Judges.
 Reversed by published opinion. Judge WILKINS wrote the opinion, in which Judge RUSSELL and Judge WILLIAMS joined.
 OPINION
 WILKINS, Circuit Judge:
 
 
 1
 We are convened to review a decision of the district court holding two statutes--one enacted by the General Assembly of North Carolina and the other enacted by the Congress of the United States--to be unconstitutional. See Hoffman v. Hunt, 923 F.Supp. 791 (W.D.N.C.1996). The district court held that a North Carolina law criminalizing the obstruction of access to or egress from health care facilities, see N.C. Gen.Stat. § 14-27 7.4 (Supp.1996),[1] is violative of the First Amendment on its face and as applied. See Hoffman, 923 F.Supp. at 802-05. And, it held that a portion of the Freedom of Access to Clinic Entrances Act (FACE) of 1994, see 18 U.S.C.A. § 248 (West Supp.1997),[2] violates the United States Constitution. See Hoffman, 923 F.Supp. at 823. We reverse.
 
 I. Facts and Procedural Background
 
 2
 Plaintiffs--Sharon Hoffman, Trudie Matthews, Diane Hoefling, Ronnie Wallace, and John Bradley--are North Carolina residents who oppose abortion for moral, religious, and scientific reasons. Their opposition has motivated them to engage in demonstrations outside facilities in North Carolina where abortions are performed. Their activities include leafleting, picketing, sidewalk counseling, and other nonviolent forms of protest designed to persuade women seeking abortions to consider alternative means of confronting an unwanted pregnancy. Additionally, Plaintiffs aspire to convince health care professionals not to perform abortions. During their participation in protests outside North Carolina clinics where abortions are performed, Plaintiffs have not engaged in "rescues"--i.e., blocking women seeking abortions and health care workers from entering clinics--and have attempted to avoid arrest by complying with instructions from law enforcement officers concerning conduct and acts prohibited by various North Carolina laws, including § 14-277.4. Nevertheless, Plaintiffs have been threatened with arrest for conduct that did not obstruct or block access to or egress from health care facilities. Because Plaintiffs believed that these enforcement efforts violated their First Amendment rights, they filed this action challenging the constitutionality of § 14-277.4 on its face and as applied to them.[3] While this lawsuit was pending before the district court, Congress enacted FACE. Plaintiffs amended their complaint to add a challenge to subsection (a)(1) of that statute on the basis that Congress lacked the authority to enact it under the Commerce Clause or § 5 of the Fourteenth Amendment and that it violated the First Amendment.[4]
 
 
 3
 Because we were then considering a constitutional challenge to FACE, the district court placed this litigation in abeyance pending the decision of this court in American Life League, Inc. v. Reno, 47 F.3d 642 (4th Cir.1995). Following the February 13, 1995 decision in American Life League--which upheld the constitutionality of FACE under the Commerce Clause and the First Amendment--but before the district court had ruled in this action, the Supreme Court decided United States v. Lopez, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995). Lopez held that Congress lacked authority under the Commerce Clause to enact the Gun-Free School Zones Act of 1990, see 18 U.S.C. § 922(q) (Supp. V 1994), which prohibited the possession of "a firearm at a place that the individual knows, or has reasonable cause to believe, is a school zone." Lopez, 514 U.S. at 551, 115 S.Ct. at 1626 (internal quotation marks omitted). Believing that Lopez cast considerable doubt on the continuing validity of American Life League, the district court sought additional briefing directed to that issue.
 
 
 4
 Thereafter, the district court conducted an evidentiary hearing with respect to the enforcement of § 14-277.4. During that hearing, Plaintiffs offered evidence concerning their experiences while participating in abortion protests. Defendants elected not to submit any evidence. Based on the testimony presented, the district court rendered findings of fact that are not challenged on appeal. Specifically, the district court found:
 
 
 5
 Police have interpreted [ § 14-277.4] in different ways and have difficulty deciding the meaning of the words "interfere", "obstruct", "impede", and "delay."
 
 
 6
 The Plaintiffs have attempted to have police define for them exactly what they may and may not do in order to comply with the statute, but have received varying interpretations from police officers.
 
 
 7
 There are different interpretations in different police districts and among police in the same district. For example, ... [s]ome officers prohibit the handing out of leaflets to occupants of automobiles entering the clinic because that will impede traffic and constitute interference under the statute. Some officers allow the picketers to wave pro-life literature to get the attention of persons entering the driveway. Others do not. Some officers allow the leafletters to yell to people in the parking lot, others don't.
 
 
 8
 Hoffman, 923 F.Supp. at 800 (citations omitted). Based on Plaintiffs' evidence, the district court held that § 14-277.4 was unconstitutional under the First Amendment, both on its face and as applied. See id. 923 F.Supp. at 802-05. The district court also ruled that in enacting FACE Congress had exceeded its authority under the Commerce Clause and under § 5 of the Fourteenth Amendment and, further, that FACE was violative of the First Amendment. See id. 923 F.Supp. at 805-23. Consequently, the district court permanently enjoined the enforcement of both the state and federal statutes. See id. 923 F.Supp. at 823. We address these holdings in turn.[5]
 
 II. First Amendment Challenge to § 14-277.4
 
 9
 North Carolina challenges the determination of the district court that N.C. Gen.Stat. § 14-277.4 is unconstitutional on its face and as applied. That statute provides, in pertinent part:
 
 
 10
 (a) No person shall obstruct or block another person's access to or egress from a health care facility or from the common areas of the real property upon which the facility is located in a manner that deprives or delays the person from obtaining or providing health care services in the facility.
 
 
 11
 ....
 
 
 12
 (e) This section shall not prohibit any person from engaging in lawful speech or picketing which does not impede or deny another person's access to health care services or to a health care facility or interfere with the delivery of health care services within a health care facility.
 
 
 13
 N.C. Gen.Stat. § 14-277.4(a), (e). The district court held that this provision was invalid on its face as impermissibly vague and overbroad and that it had been applied to Plaintiffs in an unconstitutional manner. We agree with North Carolina that the statute, on its face, is neither vague nor overbroad. But, we need not reach the question of whether it has been applied unconstitutionally.
 
 A.
 
 14
 The First Amendment provides, inter alia, that "Congress shall make no law ... abridging the freedom of speech." U.S. Const. amend. I. And, "[i]t has long been established that" First Amendment rights "are protected by the Fourteenth Amendment from invasion by the States." Edwards v. South Carolina, 372 U.S. 229, 235, 83 S.Ct. 680, 683, 9 L.Ed.2d 697 (1963). Here, Plaintiffs alleged that North Carolina violated their First Amendment right of free speech by enacting a statute that is both vague and overbroad.
 
 
 15
 The district court concluded that the North Carolina statute was impermissibly vague because the evidence before the court established that law enforcement officers had given differing, and sometimes inconsistent, interpretations of the statute in the course of enforcing it. The court reasoned that the officers' differing views regarding the proper meaning of the statute compelled the conclusion that the statute did not give a person of ordinary intelligence reasonable notice of what conduct is prohibited. See Hoffman, 923 F.Supp. at 802-04 (citing Grayned v. City of Rockford, 408 U.S. 104, 108-09, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972)).
 
 
 16
 We hold, however, that § 14-277.4 is not impermissibly vague. The operative language--declaring that "[n]o person shall obstruct or block another person's access to or egress from a health care facility ... in a manner that deprives or delays the person from obtaining or providing health care services"--sets forth in plain and simple terms the prohibited conduct. N.C. Gen.Stat. § 14-277.4(a). The terms "obstruct" and "block" do not require those subject to the statute to guess at their meaning. See Cameron v. Johnson, 390 U.S. 611, 616, 88 S.Ct. 1335, 1338, 20 L.Ed.2d 182 (1968). The term "obstruct" means "to block or close up by an obstacle." Webster's Ninth New Collegiate Dictionary 816 (1990). Similarly, to "block" something is "to make [it] unsuitable for passage or progress by obstruction." Id. at 160. According to its plain language, then, the statute prohibits only conduct that physically interferes with a person's ability to enter or to exit a health care facility in a specified manner. See Moskal v. United States, 498 U.S. 103, 108, 111 S.Ct. 461, 465, 112 L.Ed.2d 449 (1990) (observing that courts must "giv[e] the words used their ordinary meaning" (internal quotation marks omitted)). Because the statutory language "clearly and precisely delineates its reach in words of common understanding," it is not void on its face for vagueness. Cameron, 390 U.S. at 616, 88 S.Ct. at 1338 (holding that statute prohibiting conduct that "obstruct[s] or unreasonably interfere[s] with free ingress or egress to and from" public buildings was not impermissibly vague).
 
 
 17
 We also disagree with the determination of the district court that the statute is overbroad because it authorizes the arrest of persons whose peaceful protests achieved the intended goal of persuading women not to have abortions. See Hoffman, 923 F.Supp. at 804-05. As explained above, the plain language of the statute prohibits only conduct that imposes physical impediments to entering or exiting a health care facility. As the Supreme Court has held, "[p]rohibition of [such] conduct ... does not abridge constitutional liberty 'since such activity bears no necessary relationship to the freedom to ... distribute information or opinion.' " Cameron, 390 U.S. at 617, 88 S.Ct. at 1339 (fourth alteration in original) (quoting Schneider v. New Jersey, 308 U.S. 147, 161, 60 S.Ct. 146, 150, 84 L.Ed. 155 (1939)). Accordingly, because § 14-277.4 does not, on its face, encumber a substantial amount of protected expression, it is not overbroad. See New York v. Ferber, 458 U.S. 747, 766-73, 102 S.Ct. 3348, 3359-63, 73 L.Ed.2d 1113 (1982).
 
 
 18
 Moreover, subsection (e) does not render the statute overbroad, despite Plaintiffs' argument to the contrary. Subsection (e) provides that subsection (a) does not apply to "any person ... engaging in lawful speech or picketing which does not impede or deny another person's access to health care services." N.C. Gen.Stat. § 14-277.4(e). This provision is nothing more than a savings clause, designed to assure that the North Carolina statute is not construed to reach constitutionally protected speech that does not impede or deny access to health care facilities. By its terms, subsection (e) prohibits nothing; rather, it serves as a rule of construction. See Garnett By and Through Smith v. Renton Sch. Dist. No. 403, 987 F.2d 641, 644-45 (9th Cir.1993). Thus, subsection (e) does not criminalize constitutionally protected speech.
 
 B.
 
 19
 The district court also ruled that § 14-277.4 had been applied in an unconstitutional manner. See Hoffman, 923 F.Supp. at 805. We agree with the district court that the uncontroverted evidence shows that law enforcement officers have threatened Plaintiffs with arrest under the statute for engaging in constitutionally protected activities. For example, individuals have been threatened with arrest for attempting to distribute literature to persons entering clinics. See id. 923 F.Supp. at 800. On another occasion, a protestor was informed that her mere presence--and the presence of other picketers--violated the statute because patients were rescheduling their appointments. See id. 923 F.Supp. at 798. Peaceful leafletting and picketing are both forms of expression meriting First Amendment protection, see United States v. Grace, 461 U.S. 171, 176, 103 S.Ct. 1702, 1706, 75 L.Ed.2d 736 (1983), and the record provides no indication that the activities in which Plaintiffs engaged physically obstructed or blocked access to or egress from health care facilities. Thus, the application of § 14-277.4 to such conduct would present a substantial constitutional question.
 
 
 20
 Indeed, North Carolina does not dispute that the statute has been enforced in an unconstitutional manner. Instead, it argues that because Plaintiffs have never been arrested for a violation of § 14-277.4, they do not have standing to challenge its application. But, this argument is misplaced. It is well settled that a genuine threat of enforcement is sufficient to confer standing to obtain a declaratory judgment concerning whether the threatened application would violate the First Amendment. See Steffel v. Thompson, 415 U.S. 452, 459, 475, 94 S.Ct. 1209, 1215-16, 1223-24, 39 L.Ed.2d 505 (1974).[6]
 
 
 21
 However, we need not reach the constitutional question if there exists an alternative, nonconstitutional basis for our decision. See Peters v. Hobby, 349 U.S. 331, 338, 75 S.Ct. 790, 793-94, 99 L.Ed. 1129 (1955). Accordingly, before deciding whether application of § 14-277.4 to protected speech would violate the First Amendment, we first determine whether the statute permits such an application. See id. (examining whether action taken by loyalty review board was consistent with the power granted to the board by executive order before considering whether the action was constitutional). As discussed above, § 14-277.4 does not reach protected speech. Accordingly, it is not violated by peaceful protest activity that does not physically obstruct or block access to or egress from a health care facility. Because law enforcement officers exceeded their authority in threatening Plaintiffs with arrest for activities that did not violate § 14-277.4, we need not determine whether these threats also contravened the First Amendment.
 
 III. Commerce Clause Analysis of FACE
 
 22
 The Founding Fathers sought through the Constitution to devise a form of government in which the opportunity for the governing to tyrannize the governed would be minimized through a system of offsetting and separated powers. A paramount component of their design was the establishment of a federal government of limited and enumerated powers and the recognition that state governments possess all remaining " 'numerous and indefinite' " powers. United States v. Lopez, 514 U.S. 549, 552, 115 S.Ct. 1624, 1626, 131 L.Ed.2d 626 (1995) (quoting The Federalist No. 45, at 292-93 (James Madison) (Clinton Rossiter ed., 1961)). As with the separation of powers among the coordinate branches of the federal government, this segregation of power between state and federal governments was designed to reduce the danger of oppression inherent in unchecked power. See id.
 
 
 23
 One of the enumerated powers apportioned to the federal government is contained in the Commerce Clause, which provides that "[t]he Congress shall have Power ... [t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3. From early in our history as a nation, the Commerce Clause has been understood as a broad grant of the power "to prescribe the rule[s] by which commerce is to be governed," limited only by constitutional constraints. Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 196, 6 L.Ed. 23 (1824).
 
 
 24
 We need not restate the development of Commerce Clause jurisprudence for discussions of its evolution abound. See, e.g., Lopez, 514 U.S. at 553-59, 115 S.Ct. at 1626-30; Steven A. Delchin, Note, Viewing the Constitutionality of the Access Act Through the Lens of Federalism, 47 Case W. Res. L.Rev. 553, 559-74 (1997). Suffice it to say that by late 1994 and early 1995, when the appeal in American Life League was under deliberation, the principles governing the analysis of Congress' authority under the Commerce Clause were considered to be firmly established. The Supreme Court had "made clear that the commerce power extends not only to 'the use of channels of interstate or foreign commerce' and to 'protection of the instrumentalities of interstate commerce ... or persons or things in commerce,' but also to 'activities affecting commerce.' " Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc., 452 U.S. 264, 276-77, 101 S.Ct. 2352, 2360, 69 L.Ed.2d 1(1981) (alteration in original) (quoting Perez v. United States, 402 U.S. 146, 150, 91 S.Ct. 1357, 1359, 28 L.Ed.2d 686 (1971)). Further, it was well established that when a reviewing court attempted to determine whether Congress had exceeded its commerce power, its task was merely to ask whether a rational basis existed for concluding that the regulated activity affected interstate commerce. See id. This standard of review was so deferential to congressional judgment, and the transformation from a local to a national economy so complete, that it was widely accepted that Congress possessed virtually unlimited authority to legislate under the Commerce Clause. See, e.g., Deborah Jones Merritt, Commerce!, 94 Mich. L.Rev. 674, 675 (1995). Indeed, it had been approximately 60 years since the Supreme Court had invalidated any provision adopted by Congress as exceeding its commerce power.
 
 
 25
 Against this legal background, this court decided American Life League, Inc. v. Reno, 47 F.3d 642 (4th Cir.1995), in which we applied these well-settled rules of Commerce Clause adjudication to FACE and held that the extensive legislative record provided a rational basis for Congress to conclude "that the regulated activity affects interstate commerce." Id. 47 F.3d at 647. We pointed to the following facts upon which Congress relied to find that interstate commerce was threatened by the activity regulated by FACE: "Many women travel across state lines to seek reproductive health care"; "[r]eproductive health facilities engage doctors and other staff in an interstate market"; "[t]hese facilities buy medical and office supplies that move in interstate commerce"; and "[c]linics have been closed because of blockades and sabotage and have been rendered unable to provide services." Id. (internal quotation marks omitted). Based on these findings, we held "that the commerce power permits Congress to regulate activities affecting reproductive health services." Id.
 
 
 26
 The United States argues that the district court erred in failing to follow American Life League and that our analysis of whether, in enacting FACE, Congress acted within its authority to regulate activities that substantially affect interstate commerce is controlled by that opinion. "A decision of a panel of this court becomes the law of the circuit and is binding on other panels unless it is overruled by a subsequent en banc opinion of this court or 'a superseding contrary decision of the Supreme Court.' " Etheridge v. Norfolk & Western Ry. Co., 9 F.3d 1087, 1090 (4th Cir.1993) (quoting Busby v. Crown Supply, Inc., 896 F.2d 833, 840-41 (4th Cir.1990)). Since there has been no intervening en banc decision calling American Life League into question, we are bound by our prior opinion unless it proves untenable in light of the later Supreme Court decision in United States v. Lopez, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995). See United States Dep't of Health & Human Servs. v. FLRA, 983 F.2d 578, 581-82 (4th Cir.1992) ("A decision by a panel of this court, or by the court sitting en banc, does not bind subsequent panels if the decision rests on authority that subsequently proves untenable."); Faust v. South Carolina State Highway Dep't, 721 F.2d 934, 940 (4th Cir.1983) (same). For the reasons that follow, we conclude that the result of American Life League controls our decision.
 
 
 27
 Because the reasoning expressed in Lopez is of considerable importance to our decision, we recite it in some detail. In the course of reviewing the historical development of Commerce Clause jurisprudence, the Lopez Court emphasized that even the modern-era decisions giving an expansive reading to Congress' commerce power stress that there are "outer limits" to that authority:
 
 
 28
 [T]he scope of the interstate commerce power "must be considered in the light of our dual system of government and may not be extended so as to embrace effects upon interstate commerce so indirect and remote that to embrace them, in view of our complex society, would effectually obliterate the distinction between what is national and what is local and create a completely centralized government."
 
 
 29
 Id. at 556-57, 115 S.Ct. at 1628-29 (quoting NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1, 37, 57 S.Ct. 615, 624, 81 L.Ed. 893 (1937)). And, the Court noted that it had "heeded that warning and undertaken to decide whether a rational basis existed for concluding that a regulated activity sufficiently affected interstate commerce." Id. at 557, 115 S.Ct. at 1629. Thus, although the Commerce Clause granted Congress broad authority " 'to regulate commerce,' " id. (quoting Maryland v. Wirtz, 392 U.S. 183, 196, 88 S.Ct. 2017, 2023-24, 20 L.Ed.2d 1020 (1968)), the Court continued, Congress may not " 'use a relatively trivial impact on commerce as an excuse for broad general regulation of state or private activities,' " id. (quoting Wirtz, 392 U.S. at 196 n. 27, 88 S.Ct. at 2024 n. 27).
 
 
 30
 Bearing these principles in mind, the Court then set forth the three broad categories of activity that Congress may regulate consistent with the Commerce Clause:
 
 
 31
 First, Congress may regulate the use of the channels of interstate commerce. Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities. Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce, i.e., those activities that substantially affect interstate commerce.
 
 
 32
 Id. at 558-59, 115 S.Ct. at 1629-30 (citations omitted). With respect to the last category, the Court explained that despite a lack of clarity in its earlier cases, "the proper test requires an analysis of whether the regulated activity 'substantially affects' interstate commerce," not whether the activity merely "affects" interstate commerce. Id. at 559, 115 S.Ct. at 1630.
 
 
 33
 Turning to application of these principles to § 922(q), the Court quickly dismissed the first two categories--the regulation of the channels of interstate commerce and of the instrumentalities of, or persons or things traveling in, interstate commerce--as possible bases for Congress' adoption of § 922(q) and focused its attention on whether the final category could support the statute. See id. The Court first discussed whether § 922(q) could "be sustained under our cases upholding regulations of activities that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate commerce" and concluded that it could not. Id. at 561, 115 S.Ct. at 1631. The Court noted that it had "upheld a wide variety of congressional Acts regulating intrastate economic activity where [it had] concluded that the activity substantially affected interstate commerce," citing as examples the regulation of surface coal mining in Hodel, 452 U.S. at 276-83, 101 S.Ct. at 2360-63; of extortionate credit transactions in Perez, 402 U.S. at 150-57, 91 S.Ct. at 1359-63; of restaurants utilizing substantial interstate supplies in Katzenbach v. McClung, 379 U.S. 294, 301-05, 85 S.Ct. 377, 382-84, 13 L.Ed.2d 290 (1964); of hotels catering to interstate travelers in Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 253-58, 85 S.Ct. 348, 355-58, 13 L.Ed.2d 258 (1964); and of the production and consumption of homegrown wheat in Wickard v. Filburn, 317 U.S. 111, 118-29, 63 S.Ct. 82, 85-91, 87 L.Ed. 122 (1942). Lopez, 514 U.S. at 559-60, 115 S.Ct. at 1629-30. The Court characterized this body of case law as establishing a clear pattern holding that congressional regulation of economic activity that substantially affects interstate commerce will be upheld. See id. at 560, 115 S.Ct. at 1630. Pointing to Wickard--which the Court indicated was "perhaps the most far reaching example of Commerce Clause authority over intrastate activity"--the Court stressed that even the regulation of homegrown wheat intended for home consumption at issue there "involved economic activity in a way that the possession of a gun in a school zone does not." Id. The Court thus held that § 922(q) did not fit within this pattern because:
 
 
 34
 Section 922(q) is a criminal statute that by its terms has nothing to do with "commerce" or any sort of economic enterprise, however broadly one might define those terms. Section 922(q) is not an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated. It cannot, therefore, be sustained under our cases upholding regulations of activities that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate commerce.
 
 
 35
 Id. at 561, 115 S.Ct. at 1630-31 (footnote omitted).
 
 
 36
 The Court next stressed that § 922(q) contained no express jurisdictional element to insure through case-by-case examination that the possession at issue had a connection with or an effect on interstate commerce. See id. And, although recognizing that a reviewing court must undertake an independent evaluation of the constitutionality of congressional action pursuant to the commerce power and observing that Congress "normally is not required to make formal findings as to the substantial burdens that an activity has on interstate commerce," the Court noted that Congress had made no legislative findings "regarding the effects upon interstate commerce of gun possession in a school zone" that could enable the Court "to evaluate the legislative judgment that the activity in question substantially affected interstate commerce, even though no such substantial effect was visible to the naked eye." Id. at 562-63, 115 S.Ct. at 1631-32 (internal quotation marks omitted).
 
 
 37
 Finally, the Court rejected the Government's arguments that § 922(q) in fact substantially affected interstate commerce. See id. at 563-66, 115 S.Ct. at 1631-33. The Government had maintained that possession of a firearm in a school zone increased the likelihood of violent crime, which in turn disrupted interstate commerce by reducing the willingness of individuals to travel interstate to those areas that are perceived to be unsafe. Furthermore, the Government asserted that the presence of firearms in a school zone threatened the educational process, thereby causing a less productive national economy. The Court repudiated these arguments on the basis that to accept them would leave no activity beyond Congress' reach, a result antithetical to the notion that the federal government is one of limited power. See id. at 564-68, 115 S.Ct. at 1632-34. Once again stressing the importance of limited federal powers in the constitutional scheme, the Court explained that the uncertainty arising from the need to determine whether a given activity is commercial or noncommercial was not a sufficient reason to abandon the principles of federalism upon which our nation was founded. See id. at 566, 115 S.Ct. at 1633. Therefore, accepting that no "precise formulation" was available, the Court concluded that the guiding principles pointed the way to a correct decision with regard to § 922(q): "The possession of a gun in a local school zone is in no sense an economic activity that might, through repetition elsewhere, substantially affect any sort of interstate commerce." Id. at 567, 115 S.Ct. at 1634.
 
 
 38
 The question of the constitutionality of FACE in light of Lopez has provoked widespread debate. See, e.g., Kathleen F. Brickey, Crime Control and the Commerce Clause: Life After Lopez, 46 Case W. Res. L.Rev. 801, 839-43 (1996) (noting that Lopez was a counterpoint to the trend of expanding Commerce Clause authority, but that its principal legacy "may be its symbolic value"); Deborah Jones Merritt, Commerce!, 94 Mich. L.Rev. 674, 724-26 (1995) (predicting that courts will continue to find that FACE is constitutional post-Lopez ); Benjamin W. Roberson, Abortion as Commerce: The Impact of United States v. Lopez on Freedom of Access to Clinic Entrances Act of 1994, 50 Vand. L.Rev. 239, 254-68 (1997) (opining that FACE is unconstitutional in light of Lopez ); Steven A. Delchin, Note, Viewing the Constitutionality of the Access Act Through the Lens of Federalism, 47 Case W. Res. L.Rev. 553, 624 (1997) (maintaining that FACE, "as an exercise of the commerce power, is clearly a congressional overreaching of power" (footnote omitted)); Lan Hoang, Note, Freedom of Access to Clinic Entrances Act, 18 U.S.C. § 248: The Controversy Behind the Remedy, 20 Seton Hall Legis. J. 128, 166 (1996) (noting that recent Supreme Court opinions, including Lopez, "may be indicative of a potential reassessment of FACE"); Anna Kampourakis & Robin C. Tarr, Note, About F.A.C.E. in the Supreme Court: The Freedom of Access to Clinic Entrances Act in Light of Lopez, 11 St. John's J. Legal Comment. 191, 214 (1995) (noting that "[g]iven the recent conservative trend of the Supreme Court ... the prospects for FACE's survival are not bright"); John M. Scheib, Note, Cheffer v. Reno: Is the Regulation of Abortion Clinic Protests the Regulation of Interstate Commerce?, 41 Vill. L.Rev. 867, 898-906 (1996) (criticizing the decision in Cheffer v. Reno, 55 F.3d 1517 (11th Cir.1995), for having ignored critical aspects of Lopez ). There is by no means a general consensus as to whether Lopez should be viewed as an epochal decision revolutionizing Commerce Clause jurisprudence as Justice Souter forewarned in his dissenting opinion, see Lopez, 514 U.S. at 614-15, 115 S.Ct. at 1656-57 (Souter, J., dissenting), or whether it merely clarifies the outer limit to Congress' commerce power. What is clear, however, is that we cannot say that the result reached in American Life League is no longer tenable in light of Lopez.
 
 
 39
 The Lopez Court made clear that its holding that Congress had exceeded its commerce authority in enacting § 922(q) was driven by a concern for maintaining a constitutionally appropriate federal-state balance of powers by interpreting the Commerce Clause in a manner that would not grant Congress a general police power. See Lopez, 514 U.S. at 552-53, 564-68, 115 S.Ct. at 1626-27, 1632-34; see also id. at 568-83, 115 S.Ct. at 1634-42 (Kennedy, J., concurring); id. at 584-602, 115 S.Ct. at 1642-51 (Thomas, J., concurring). Indeed, the Lopez decision both begins and ends its analysis with reference to the necessity of construing Congress' commerce power so that a federal government of enumerated, limited powers is preserved. See id. at 552-53, 564-68, 115 S.Ct. at 1626-27, 1632-34. The Court recognized that some line must be drawn to separate that which is truly national, and therefore is subject to congressional regulation, from that which is truly local, and therefore is not. See id. at 567-68, 115 S.Ct. at 1633-34. Although stressing that the question of where that line is to be drawn necessarily is a complex one, the Court emphasized several keys in its analysis.
 
 
 40
 The Court repeatedly pointed to a distinction between the regulation of, on the one hand, those activities that are commercial or economic in nature--or arise out of or are connected with a commercial transactionand, on the other hand, those activities that are not. In the two instances in which it stated the controlling analysis, the Court focused on the fact that the possession of a gun in a school zone was neither itself an economic or commercial activity nor had any connection with such activity. See id. at 561, 115 S.Ct. at 1630-31 ("Section 922(q) is a criminal statute that by its terms has nothing to do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms."); id. at 567, 115 S.Ct. at 1634 ("The possession of a gun in a local school zone is in no sense an economic activity that might, through repetition elsewhere, substantially affect any sort of interstate commerce."). Further, Lopez characterized its prior Commerce Clause decisions, including Wickard, Heart of Atlanta Motel, McClung, Perez, and Hodel, as upholding congressional enactments that regulated economic activities or activities that arose out of or were connected with commercial transactions. See id. at 559-60, 115 S.Ct. at 1629-30. And, in referring to the process of determining the outer limit of Congress' commerce power the Court referred to the necessity of deciding "whether an intrastate activity is commercial or noncommercial." Id. at 566, 115 S.Ct. at 1633. Finally, the Court considered important whether the regulation would intrude into an area traditionally within the sovereign power of the states or whether the subject of the regulation was one ordinarily or especially of federal concern. See id. at 561 n. 3, 563-64, 115 S.Ct. at 1631 n.3, 1631-32; id. at 580, 115 S.Ct. at 1640 (Kennedy, J., concurring) (noting that in assessing whether Congress has exceeded its commerce power, a court "must inquire whether the exercise of national power seeks to intrude upon an area of traditional state concern").
 
 
 41
 Here, the activity regulated by FACE, while not itself economic or commercial, is closely and directly connected with an economic activity; therefore, unlike the possession of a gun in a school zone prohibited by § 922(q), we cannot conclude that FACE "has nothing to do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms." Id. at 561, 115 S.Ct. at 1630-31. FACE does not regulate the provision of reproductive health care. Rather, it regulates the use of force, threat of force, or physical obstruction to intentionally injure, intimidate, or interfere with persons because they are or have been obtaining or providing reproductive health care services. Although this regulated activity is not itself commercial or economic in nature, it is closely connected with, and has a direct and profound effect on, the interstate commercial market in reproductive health care services. As the congressional reports accompanying FACE make clear, several aspects of interstate commerce are directly and substantially affected by the regulated conduct.[7] These reports indicate that many women travel across state lines to obtain reproductive health care, that facilities providing these services retain staff in an interstate employment market and utilize supplies obtained through interstate commerce, and that some reproductive health care facilities that had been the targets of the activities regulated by FACE had been forced to discontinue the provision of services. See H.R.Rep. No. 103-306, at 6-10 (1993), reprinted in 1994 U.S.C.C.A.N. 699, 703-07; H.R. Conf. Rep. No. 103-488, at 7-8 (1994), reprinted in 1994 U.S.C.C.A.N. 724, 724-25. The real and substantial connection between the conduct regulated by FACE and the interstate commercial market in reproductive health care services dictates that we need not "pile inference upon inference" to find a substantial effect on interstate commerce. Lopez, 514 U.S. at 567, 115 S.Ct. at 1634. Accordingly, FACE does not suffer from the fundamental defect underlying the Gun-Free School Zones Act of 1990: Acceptance of the proposition that Congress possesses the authority under the Commerce Clause to regulate the activity at issue in FACE will not effectively remove all limitations on Congress' commerce power. Therefore, unlike § 922(q), FACE may be upheld under the line of Supreme Court authority "upholding regulations of activities that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate commerce." Id. at 561, 115 S.Ct. at 1631. Because FACE regulates an activity that has a close connection with commercial activity and has a substantial effect on interstate commerce, we conclude that Congress possesses authority under the Commerce Clause to enact it,[8] and we thus agree with the United States that we are bound by our prior decision in American Life League.[9]
 
 IV. First Amendment Challenge to FACE
 
 42
 The United States next maintains that the district court erred in concluding that FACE is unconstitutional under the First Amendment. Although the district court correctly noted that several of Plaintiffs' First Amendment challenges were not directly foreclosed by American Life League, it nevertheless held that FACE violates the First Amendment in several respects. We disagree.
 
 
 43
 The district court first concluded that FACE was unconstitutional because its prohibition on intimidation that "creates a 'reasonable apprehension of bodily harm to him- or herself or another' " impermissibly "hinges on the subjective reaction that speech elicits from its listener." See Hoffman, 923 F.Supp. at 822 (quoting 18 U.S.C.A. § 248(e)(3) (West Supp.1997)). The district court also determined that FACE was unconstitutionally overbroad because by prohibiting speech that "creates a reasonable apprehension of bodily harm ... it reaches beyond the restriction of fighting words[and] imminent threats of lawless action that is permitted by the First Amendment." Id. (internal quotation marks omitted). Finally, the district court held that FACE was overbroad because it reaches "speech [that] threatens bodily harm to another." Id. This reasoning, however, is misdirected.
 
 
 44
 The plain language of FACE prohibits only conduct that by force or physical obstruction injures, interferes with, or intimidates the provider or recipient of reproductive health care or speech that amounts to a threat of force that obstructs, injures, intimidates, or interferes with the provider or recipient of reproductive health care. The regulation of neither the former conduct, nor the latter speech, is violative of the First Amendment. See Wisconsin v. Mitchell, 508 U.S. 476, 484, 113 S.Ct. 2194, 2199, 124 L.Ed.2d 436 (1993) ("[A] physical assault is not ... expressive conduct protected by the First Amendment."); R.A.V. v. City of St. Paul, Minn., 505 U.S. 377, 388, 112 S.Ct. 2538, 2546, 120 L.Ed.2d 305 (1992) (noting that "threats of violence are outside the First Amendment"); New York v. Ferber, 458 U.S. 747, 769-73, 102 S.Ct. 3348, 3361-63, 73 L.Ed.2d 1113 (1982) (holding that a statute must burden a substantial amount of protected speech to be unconstitutionally overbroad); Cameron v. Johnson, 390 U.S. 611, 616-17, 88 S.Ct. 1335, 1338-39, 20 L.Ed.2d 182 (1968) (upholding statute criminalizing conduct that "obstructs or unreasonably interferes with ingress or egress to and from" public buildings against First Amendment vagueness and overbreadth challenges); American Life League, 47 F.3d at 648-53 (concluding that FACE is viewpoint neutral and is neither vague nor overbroad); see also Terry v. Reno, 101 F.3d 1412, 1418-22 (D.C.Cir.1996) (rejecting First Amendment challenge to FACE), cert. denied, --- U.S. ----, 117 S.Ct. 2431, 138 L.Ed.2d 193 (1997); United States v. Soderna, 82 F.3d 1370, 1374-77 (7th Cir.) (same), cert. denied, --- U.S. ----, 117 S.Ct. 507, 136 L.Ed.2d 398 (1996); United States v. Dinwiddie, 76 F.3d 913, 921-24 (8th Cir.) (same), cert. denied, --- U.S. ----, 117 S.Ct. 613, 136 L.Ed.2d 538 (1996); Cheffer v. Reno, 55 F.3d 1517, 1521-22 (11th Cir.1995) (same).
 
 V. Conclusion
 
 45
 In sum, we hold that N.C. Gen.Stat. § 14-277.4 is not unconstitutionally overbroad or vague on its face, and North Carolina properly may enforce its provisions. Further, we hold that Congress acted within its authority under the Commerce Clause in enacting FACE and that the statute does not violate the First Amendment. Consequently, we reverse the judgment of the district court.
 
 
 46
 REVERSED.
 
 
 
 [1]
 N.C. Gen.Stat. § 14-277.4 provides, in pertinent part:
 (a) No person shall obstruct or block another person's access to or egress from a health care facility or from the common areas of the real property upon which the facility is located in a manner that deprives or delays the person from obtaining or providing health care services in the facility.
 ....
 (e) This section shall not prohibit any person from engaging in lawful speech or picketing which does not impede or deny another person's access to health care services or to a health care facility or interfere with the delivery of health care services within a health care facility.
 N.C. Gen.Stat. § 14-277.4(a), (e).
 
 
 [2]
 FACE established civil and criminal penalties for anyone who, in pertinent part,
 by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with or attempts to injure, intimidate or interfere with any person because that person is or has been, or in order to intimidate such person or any other person or any class of persons from, obtaining or providing reproductive health services.
 18 U.S.C.A. § 248(a)(1).
 
 
 [3]
 Plaintiffs initially brought this action against the State of North Carolina; Governor James B. Hunt, Jr.; the Charlotte-Mecklenburg Police Department; and an individual local law enforcement officer. Early in the litigation, the district court dismissed the Charlotte-Mecklenburg Police Department; Plaintiffs have not appealed this ruling. And, Plaintiffs voluntarily dismissed the action as to the individual law enforcement officer. We refer to the remaining state defendants collectively as "North Carolina."
 
 
 [4]
 The district court provided notice to the Attorney General of the United States that the constitutionality of FACE had been drawn into question. See 28 U.S.C.A. § 2403(a) (West 1994). Thereafter, the district court granted the motion of the United States to intervene
 
 
 [5]
 In addition to the briefing we received from the parties, we accepted amici curiae briefs from Planned Parenthood Federation of America, Incorporated; NOW Legal Defense and Education Fund; Center for Reproductive Law and Policy; American Medical Women's Association; Feminist Majority Foundation; Medical Students for Choice; National Abortion and Reproductive Rights Action League; National Abortion Federation; National Center for the Pro Choice Majority; National Organization for Women; National Women's Law Center; South Carolina National Organization for Women; Women's Law Project; Women's Legal Defense Fund; American Civil Liberties Union of North Carolina Legal Foundation, Incorporated; American Civil Liberties Union; Planned Parenthood of the Triad, Incorporated; Planned Parenthood of the Southern Piedmont and Carolina Mountains, Incorporated; United States Justice Foundation; North Carolina Family Policy Council; Focus on the Family; and Family Research Council, Incorporated. We thank the amici for their participation
 
 
 [6]
 We note that North Carolina has never argued that it is immune from suit under the Eleventh Amendment. See Edelman v. Jordan, 415 U.S. 651, 662-63, 94 S.Ct. 1347, 1355-56, 39 L.Ed.2d 662 (1974) (noting that "this Court has consistently held that an unconsenting State is immune from suits brought in federal courts by her own citizens"). Given that the possibility of sovereign immunity has been ignored by all of the parties throughout the lengthy history of this litigation, we are not inclined to exercise our discretion to consider immunity at this juncture. See Patsy v. Board of Regents, 457 U.S. 496, 515 n. 19, 102 S.Ct. 2557, 2567, 73 L.Ed.2d 172 (1982); Biggs v. Meadows, 66 F.3d 56, 60 (4th Cir.1995). Because North Carolina remains a party to this litigation, providing an appropriate defendant for an award of declaratory relief, we need not decide whether the Governor is sufficiently connected with the enforcement of § 14-277.4 so as to make him a proper defendant. See Ex parte Young, 209 U.S. 123, 157, 28 S.Ct. 441, 452-53, 52 L.Ed. 714 (1908)
 
 
 [7]
 Of course, as the Lopez Court recognized, "[s]imply because Congress may conclude that a particular activity substantially affects interstate commerce does not necessarily make it so." Lopez, 514 U.S. at 557 n. 2, 115 S.Ct. at 1629 n. 2 (internal quotation marks omitted). And, whether a specified activity affects interstate commerce in a manner sufficient to provide constitutional authority under the Commerce Clause is a matter for independent judicial determination. See id. In short, the presence of legislative findings, though helpful in assisting the court in performing its review, cannot sustain a regulation that exceeds constitutional authority. Here, as we held in American Life League, the congressional findings "are more than ample to justify Congress's invocation of the commerce power." American Life League, 47 F.3d at 647
 
 
 [8]
 We note that all of the other circuit courts of appeals that have considered the constitutionality of FACE under the Commerce Clause in the wake of Lopez uniformly have held that the statute passes constitutional muster. See Terry v. Reno, 101 F.3d 1412, 1415-18 (D.C.Cir.1996), cert. denied, --- U.S. ----, 117 S.Ct. 2431, 138 L.Ed.2d 193 (1997); United States v. Dinwiddie, 76 F.3d 913, 919-21 (8th Cir.), cert. denied, --- U.S. ----, 117 S.Ct. 613, 136 L.Ed.2d 538 (1996); United States v. Wilson, 73 F.3d 675, 679-88 (7th Cir.1995), cert. denied, --- U.S. ----, 117 S.Ct. 46, 136 L.Ed.2d 12 and --- U.S. ----, 117 S.Ct. 47, 136 L.Ed.2d 12 (1996); Cheffer v. Reno, 55 F.3d 1517, 1519-21 (11th Cir.1995)
 
 
 [9]
 Because we conclude that Congress possesses the authority to enact FACE as an activity substantially affecting interstate commerce, we need not reach the alternative arguments of the United States that Congress possessed authority to enact FACE as a measure for the protection of persons or things in interstate commerce under the second category of Commerce Clause powers or under § 5 of the Fourteenth Amendment