UNITED STATES of America, Plaintiff,

v.

Norman WESLIN, Dwight Monagan, Barton Chamberlin, Arnold Matheson, John Blanchard, Michael Illuzi, Karen Jackson, Daniel Lamontain–Leatherman, Robert Raco, Randolph Smith and Rene Riddle, Defendants.

No. 97–CR–6021L.

United States District Court,
W.D. New York.

May 6, 1997.

**84**

Brian M. McCarthy, Asst. U.S. Atty., Rochester, NY, for U.S.

John J. Broderick, Syosset, NY, Mary E. Taylor, Rochester, NY, Marilyn Heller, Richmond Hill, NY, Ellin Regis, Jamaica Estates, NY, for defendants.

*DECISION AND ORDER*

LARIMER, Chief Judge.

The eleven defendants in this action are charged in an information with violating the Freedom of Access to Clinic Entrances Act ("FACE" or "the Act"), 18 U.S.C. § 248. In pertinent part, FACE provides penalties for anyone who "by force or threat of force or by physical obstruction, intentionally injures, intimidates, or interferes with or attempts to injure, intimidate or interfere with any person because that person is or has been, or in order to intimidate such person or any other person or any class of persons from, obtaining or providing reproductive health services." 18 U.S.C. § 248(a)(1). The Act defines "interfere with" as meaning "to restrict a person's freedom of movement," and "intimidate" as "to place a person in reasonable apprehension of bodily harm to him- or herself or to another." 18 U.S.C. §§ 248(e)(2), 248(e)(3).

Defendants are anti-abortion activists who were arrested on December 7, 1996, outside a facility operated by Planned Parenthood of Rochester and the Genesee Valley Inc. on University Avenue in Rochester, New York.

One of the defendants, Norman Weslin, has moved to dismiss the information on the ground that FACE is unconstitutional.

## DISCUSSION

### I. First Amendment Free Speech Clause

Defendant Weslin contends that FACE violates his right to freedom of speech under the First Amendment to the United States Constitution. He maintains that the Act is an impermissible content-based regulation because it is aimed at speech and expressive conduct that is intended to prevent persons from providing or obtaining reproductive health services.

Although the Second Circuit has not yet addressed the issue, there is a substantial body of case law involving challenges to the Act, including challenges based on the Free Speech Clause. Nearly all the reported cases that have addressed these arguments have held that the Act does not unconstitutionally impinge on freedom of speech, and I reach the same conclusion.

At the outset, it should be noted that the "Act does not target protected speech. It prohibits three types of conduct: use of force, threat of force, and physical obstruction." *Terry v. Reno*, 101 F.3d 1412, 1418 (D.C.Cir.1996), *petition for cert. filed*, 65 U.S.L.W. (U.S. Mar. 10, 1997) (No. 96–1425). The court in *Terry* noted that the Supreme Court has ruled that the government can constitutionally punish all three of those types of conduct. *Id.* at 1418–19 (citing *Wisconsin v. Mitchell*, 508 U.S. 476, 484, 113 S.Ct. 2194, 2199, 124 L.Ed.2d 436 (1993) (physical assault "is not by any stretch of the imagination" protected conduct); *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 773, 114 S.Ct. 2516, 2529, 129 L.Ed.2d 593 (1994) (threats are proscribable under First Amendment); *Cameron v. Johnson*, 390 U.S. 611, 617, 88 S.Ct. 1335, 1338–39, 20 L.Ed.2d 182 (1968) (government may punish physical obstruction that makes passage impossible or unreasonably hazardous)).

■ To the extent that the Act may have some effect on expressive conduct, a threshold question for determining its consti-

tutionality is whether the Act is "content-based," *i.e.*, whether it regulates speech or conduct "based on hostility—or favoritism—towards the underlying message expressed." *R.A. V. v. St. Paul*, 505 U.S. 377, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992). If so, the statute is unconstitutional unless it survives strict scrutiny, which requires the government to prove that the statute "is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Perry Ed. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983). If the statute is content-neutral, however, it need not survive strict scrutiny. If a content-neutral statute burdens expressive conduct, it must be subjected to intermediate scrutiny, under which a statute will be upheld "if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *United States v. O'Brien*, 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968).

Applying this analysis, I find that FACE is content-neutral, and is therefore subject to intermediate rather than strict scrutiny. In *United States v. Dinwiddie*, 76 F.3d 913 (8th Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 613, 136 L.Ed.2d 538 (1996), the Eighth Circuit discussed this issue at some length. Finding the Act to be content-neutral, the court observed that "[r]ather than imposing a content-based restriction on speech, FACE's proscription of 'threats of force' that 'place a person in reasonable apprehension of bodily harm' regulates speech that is not protected by the First Amendment." *Id.* at 922 (quoting 18 U.S.C. §§ 248(a)(1), 248(e)(3)). The court rejected the defendant's argument that the Act is content-based insofar as it only proscribes conduct engaged in "because" another person is obtaining or providing reproductive health services, stating that "FACE's motive requirement does not discriminate against speech or conduct that expresses an abortion-related message. Thus, FACE would prohibit striking employees from obstructing access to a clinic in order to stop women from getting abortions, even if the workers were carrying signs that said, 'We are underpaid!' rather than 'Abortion in wrong!'" *Id.* at 923. The motive requirement, the court observed, simply "filter[s] out conduct that Congress believes need not be covered by a federal statute," such as random crimes that might happen to occur in the vicinity of an abortion clinic. *Id.* The fact that most of the persons who violate the Act may oppose abortion, the court said, also did not transform FACE into a content-based statute. A group of persons cannot render a statute unconstitutional by violating it more than other people, the court reasoned, since "there is no disparate-impact theory in First Amendment law." *Id. See also Terry*, 101 F.3d at 1419 ("That the majority of those whose conduct the statute punishes probably oppose abortion does not call the statute's neutrality into question"); *United States v. Soderna*, 82 F.3d 1370, 1376 (7th Cir.) (defendants "cannot obtain constitutional immunity by violating a statute more frequently than any other group"), *cert. denied*, —— U.S. ——, 117 S.Ct. 507, 136 L.Ed.2d 398 (1996).

In *American Life League, Inc. v. Reno*, 47 F.3d 642 (4th Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 55, 133 L.Ed.2d 19 (1995), the Fourth Circuit likewise held that the Act is content-neutral. In reaching that decision, the court noted that "[t]he neutrality inquiry does not focus on the motive of the violator," but on Congress's purpose in enacting the statute. *Id.* at 649. The court said that the Act's "unambiguous provisions do not target any message based on content or viewpoint," and that FACE "punishes anyone who engages in the prohibited conduct," regardless of that person's viewpoint. Like the court in *Dinwiddie*, the court also held that "[t]he 'because' or motive element does not render the Act content or viewpoint based.... [T]he Act's motive requirement simply narrows its reach, and this narrowing is within congressional prerogative." *Id.* at 650. The court noted that various statutes that prohibit discrimination or other injurious acts because of the victim's race, sex, age, participation in certain federal programs, and other factors, have all been held

constitutional by the Supreme Court. *Id.* (citing cases).

In support of his contention that FACE is content- or viewpoint-based, defendant relies upon the Supreme Court's decision in *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 112 S.Ct. 2538, 120 L.Ed.2d 305, in which the Court invalidated a Minnesota ordinance that made it a misdemeanor for anyone to place on public or private property any object or symbol "which one knows or has reasonable grounds to know arouses anger, alarm or resentment in others on the basis of race, color, creed, religion or gender ..." That ordinance is clearly distinguishable from FACE, however, because FACE "targets not expression, but conduct." *Terry*, 101 F.3d at 1420. The court in *Terry* noted that in *Wisconsin v. Mitchell*, 508 U.S. 476, 113 S.Ct. 2194, 124 L.Ed.2d 436 (1993), which upheld a Wisconsin statute that enhanced the sentence for aggravated battery if the aggressor intentionally selected his victim because of the victim's race, religion, or certain other characteristics, the Supreme Court distinguished that statute from the ordinance struck down in *R.A.V.* The Court pointed out that the ordinance in *R.A.V.* explicitly targeted expression—"'fighting words' that insult, or provoke violence 'on the basis of race, color, creed, religion, or gender'"—whereas the Wisconsin statute targeted conduct unprotected by the First Amendment. *Mitchell*, 508 U.S. at 487, 113 S.Ct. at 2200. The court in *Terry* found FACE to be indistinguishable for purposes of free-speech analysis from the statute upheld in *Mitchell*. *Terry*, 101 F.3d at 1420. *See also Planned Parenthood of the Columbia/Willamette v. American Coalition of Life Activists*, 945 F.Supp. 1355, 1376 (D.Or.1996) ("Unlike the ordinance in *R.A.V.*, FACE is not viewpoint-based because it prohibits all conduct regardless of the violator's viewpoint so long as that conduct is directed towards a person merely because that person obtains or provides reproductive health services").

I agree with the reasoning of these cases, and conclude that FACE is content-neutral. That does not end the inquiry, however, for despite its content-neutrality, the Act does burden some expressive conduct, such as peaceful but obstructive picketing. *Dinwiddie*, 76 F.3d at 923; *American Life League*, 47 F.3d at 648. The Act is therefore subject to intermediate scrutiny.

Many courts have noted that the Act furthers several important or substantial governmental interests. *See, e.g., Terry*, 101 F.3d at 1419 (FACE "furthers several important government interests," including ensuring access to, and protecting the constitutional right to obtain, lawful health services and protecting women's constitutional right to seek abortions and other pregnancy-related treatment); *Dinwiddie*, 76 F.3d at 924 ("FACE furthers the government's interest in protecting women who obtain reproductive-health services and ensuring that reproductive-health services remain available"); *American Life League*, 47 F.3d at 651–52 (FACE furthers several important interests, including protecting public health, safety and commerce, and protecting women and men from violence and threats in the exercise of their rights); *Planned Parenthood Ass'n of Southeastern Pennsylvania, Inc. v. Walton*, 949 F.Supp. 290, 293 (E.D.Pa.1996) (FACE furthers government's "strong interest in protecting a woman's freedom to seek lawful medical or counseling services in connection with her pregnancy") (quoting *Madsen*, 512 U.S. at 767, 114 S.Ct. at 2526; *Planned Parenthood of the Columbia Willamette*, 945 F.Supp. at 1377 (same)).

FACE is also unrelated to the suppression of free expression. As the court noted in *American Life League*, "[t]his analysis is essentially the same as the content- and viewpoint-neutrality test ..." 47 F.3d at 652. For the same reasons that I found the Act to be content-neutral, then, I find that the governmental interests furthered by the Act are unrelated to the suppression of free expression. *See also Soderna*, 82 F.3d at 1374–75 ("It is not at all clear that the statute is 'aimed' at the anti-abortion movement," since the Act is concerned with conduct that has "physical consequences that are independent of symbolic significance").

I also find that the incidental restrictions imposed by FACE on First Amendment freedoms are sufficiently narrow. The Act proscribes only a limited number of activi-

ties—force, threats, and physical obstruction—none of which are protected by the First Amendment. As the Eighth Circuit stated in *Dinwiddie*, FACE simply "forbids physical interference with people going about their own lawful private business." 76 F.3d at 924. Furthermore, the Act leaves open many other means for anti-abortion activists to express their views in public. "In a non-violent, non-obstructive manner, protestors may still stand outside reproductive health facilities and express their anti-abortion message. They may still proclaim their views and make their pleas by voice, signs, handbills, symbolic gestures and other expressive means." *American Life League*, 47 F.3d at 652 (footnote omitted); *accord Terry,* 101 F.3d at 1420; *see also Soderna*, 82 F.3d at 1375 (FACE "does not close the channels of protest to the right to life movement"); *Dinwiddie*, 76 F.3d at 924 (FACE "is narrowly tailored to further the government's interests.... It is difficult to conceive of any such statute that could not survive this level of scrutiny"). I conclude, therefore, that FACE does not violate the Free Speech Clause.[1]

## II. First Amendment Free Exercise Clause

Defendant contends that FACE violates the First Amendment's proscription of any law that prohibits the free exercise of religion. In support of this contention, defendant also relies upon the Religious Freedom Restoration Act of 1993, ("RFRA"), 42 U.S.C. §§ 2000bb–2000bb–4. RFRA provides in pertinent part that

Government may substantially burden a person's exercise of religion only if it

demonstrates that application of the burden to the person—

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest.

I find that FACE does not violate the Free Exercise Clause. It is aimed at certain conduct without regard to whether that conduct is religiously motivated. Anyone who engages in that conduct is subject to the Act's penalties, regardless of whether he is an atheist, a devout Christian, or a follower of any other religion. Since FACE "punishes conduct for the harm it causes, not because the conduct is religiously motivated," then, by necessity "the Act does not punish religious belief." *American Life League*, 47 F.3d at 654. "Under the Act it makes no difference whether a violator acts on the basis of religious conviction or temporal views. The same conduct is outlawed for all. Therefore, the Act is a generally applicable law, neutral toward religion." *Id. See also Cheffer v. Reno*, 55 F.3d 1517, 1522 (11th Cir.1995) (adopting reasoning of *American Life League* with respect to Free Exercise Clause).

I also find that FACE is not in conflict with RFRA. In *American Life League*, the court held that FACE "serves sufficiently compelling governmental interests" and "is sufficiently narrow" to comply with RFRA. 47 F.3d at 656. The court observed that FACE "protects public health by promoting unobstructed access to reproductive health facilities" and that it "protects public safety by proscribing all violent, threatening or obstructive conduct specifically aimed at patients and providers of reproductive health services." *Id.* The court further stated that "[t]he Act's prohibitions are directed only to those actions Congress found to be a national problem, specifically force, threat of force and physical obstruction." *Id.*

In *Cheffer*, the court found it unnecessary to consider whether FACE is the least re-

---

1. The court has found a single case, *Hoffman v. Hunt*, 923 F.Supp. 791 (W.D.N.C.1996), holding that FACE violates the First Amendment, but, despite the court's assertion in that case that the bases for that holding had not been addressed by the Fourth Circuit in *American Life League, see Hoffman*, 923 F.Supp. at 821, I believe that *American Life League* nevertheless casts the correctness of *Hoffman* into doubt. I also do not find persuasive *Hoffman*'s holding that FACE is overbroad because its prohibition of "intimidating" speech is based on the subjective reaction that it elicits from the listener. As the Eighth Circuit noted in rejecting that same reasoning in *Dinwiddie*, "this reasoning does not apply to statutes that outlaw threats of violence". 76 F.3d at 922.

strictive means to further a compelling state interest, because the court found that the Act did not "substantially burden" the only religious practices that the plaintiffs asserted on appeal. 55 F.3d at 1522. The plaintiffs in *Cheffer* asserted that they had a sincerely held religious belief that abortion is murder, and that FACE chilled their expression of that belief. However, the court noted, the plaintiffs did not assert that the exercise of their religion required them to use physical force or threats of physical force to prevent abortions, or to physically obstruct clinic entrances. Since FACE left the plaintiffs "ample avenues ... to express their deeply-held belief so long as this expression d[id] not involve physical force, threats of physical force, or physical obstruction," the court concluded, the Act survived the plaintiffs' challenge under RFRA. *Id. See also Walton*, 949 F.Supp. at 296 (any incidental burden on the exercise of religion is adequately justified by the government's compelling interest in regulating use or threat of force or physical obstruction of clinic entrances).

In the case at bar, defendant has not clearly articulated how he contends that FACE violates RFRA. He states that his Free Exercise Clause argument "is informed by" RFRA, and quotes the entire text of RFRA, but has not explained how FACE runs afoul of RFRA. Defendant's Memorandum of Law at 2. Like the plaintiffs in *Cheffer*, defendant also has not expressly alleged that the exercise of his religion requires him to use force, threats of force, or physical obstruction of clinic entrances to prevent abortions. Defendant states only that he and his codefendants "are called to remain faithful to God's word," that they have "a religious duty to 'oppose [abortion] by conscientious objection,'" and that when they were arrested, defendants "were exercising their right to pursue their religious beliefs as explicitly directed by the Holy Father, the head of the Roman Catholic Church." Defendant's Memorandum of Law at 3, 6. Defendant does not allege, however, that the Catholic Church has directed its followers to engage in the conduct prohibited by FACE. He states only that the Pope has exhorted Catholics "to go beyond the negative and take positive measures to promote life," and has "cited examples within our faith

of 'resistance to the unjust commands of those in authority' ..." Defendant's Memorandum of Law at 5 (quoting *Evangelium Vitae*, at 82). Defendant's statement that he has "a religious duty to 'oppose [abortion] by conscientious objection,'" does not show that his religion imposes on him a duty to engage in the kind of conduct with which he is charged in this case. Defendant's Memorandum of Law at 3 (quoting *Evangelium Vitae*, ¶ 73; brackets in original). Defendant has not demonstrated why conscientious objection to abortion necessarily entails the use of force, threats, or physical obstruction of clinic entrances. As in *Cheffer*, then, defendant has not established that FACE "substantially burdens" the religious practices that he has identified, which makes it unnecessary to consider whether FACE is the least restrictive means necessary to further the government's interests.

Even if defendant did allege that his religious beliefs required him to engage in activity prohibited by FACE, however, I agree with *American Life League* that FACE does not violate RFRA. As explained in connection with defendant's free-speech claim, the Act is narrowly drawn, prohibiting only the use or threat of force, and physical obstruction, the sources of the nationwide problem that Congress sought to remedy. "The Act does not sweep within its prohibitions activity unrelated to the serious trouble Congress sought to address." *American Life League*, 47 F.3d at 656.

## III. Commerce Clause

■ Defendant also asserts that FACE exceeds Congress's authority to regulate interstate commerce under the Commerce Clause, U.S. Const. art. I, § 8, cl. 3. He contends that protests at abortion clinics do not constitute economic activity, and that Congress therefore has no power to regulate such activity.

Virtually every court that has addressed this argument has rejected it. In fact, one of the only courts to find that FACE did exceed Congress's authority under the Commerce Clause, *United States v. Wilson*, 880 F.Supp. 621 (E.D.Wis.1995), was subsequently re-

versed on appeal. *See United States v. Wilson*, 73 F.3d 675 (7th Cir.1995), *cert. denied*, — U.S. —, 117 S.Ct. 47, 136 L.Ed.2d 12 (1996). I join these other courts in holding that Congress acted well within its authority in enacting FACE.

■ At the outset, I note that the court's task in assessing the constitutionality of a statute under the Commerce Clause "is relatively narrow. The court must defer to a congressional finding that a regulated activity affects interstate commerce, if there is any rational basis for such a finding." *Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264, 276, 101 S.Ct. 2352, 2360, 69 L.Ed.2d 1 (1981).

In enacting FACE, Congress found for several reasons that abortion clinics engage in interstate commerce, and that violent and disruptive protests at those clinics had a significant effect on the clinics' operations. Congress found, for example, that clinics obtain medical supplies through interstate commerce, that clinic employees and patients travel interstate, and that clinics own and lease property and generate income. Congress also concluded that obstruction of reproductive-health care facilities decreases the overall availability of reproductive-health services nationwide. *See* S.Rep. No. 103–117 (1993); H.R.Rep. No. 103–306 (1993). "[T]his legislative record amply supports Congress's finding that the activities of anti-abortion activists affect interstate commerce ..." *Terry*, 101 F.3d at 1416. *See also Wilson*, 73 F.3d at 680 (Congress's findings regarding the interstate nature of the activities regulated by FACE are "plainly rational"); *American Life League*, 47 F.3d at 647 (Congress rationally concluded that violence, threats of force, and obstruction aimed at persons seeking or providing reproductive-health services affect interstate commerce).

■ The fact that the regulated activities have some effect on interstate commerce, however, is not in itself enough to support a finding of constitutional authority. In *United States v. Lopez*, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), the Supreme Court made clear that Congress must have had a rational basis for concluding that the activities in question "*substantially* affect interstate commerce." *Id.* at —, 115 S.Ct. at 1630 (emphasis added). I find that Congress did have such a basis, a finding also supported by ample case authority. *See Planned Parenthood of the Columbia/Willamette*, 945 F.Supp. at 1375 ("all circuits which have addressed the issue agree that Congress rationally concluded that the activity regulated by FACE substantially affects interstate commerce") (collecting cases). Although the statute does not use the word "substantial" (which is unsurprising, since it was enacted prior to *Lopez*), "[i]n light of the Senate Report's detailed review of the effect violent and obstructive anti-abortion protest has had upon the availability of abortions nationwide, [there is] no doubt that Congress found the impact of such activities on interstate commerce to be substantial." *Terry*, 101 F.3d at 1417.

I am not persuaded by defendant's argument that FACE does not meet the standards set forth in *Lopez*. In that case, the Supreme Court struck down the Gun–Free School Zones Act of 1990, 18 U.S.C. § 922(q), which made possession of a gun within a school zone a federal offense. FACE, however, "fundamentally differs from the statute struck down in *Lopez*" because FACE prohibits activities—force, threats, and physical obstruction—that directly affect interstate commerce, whereas the statute in *Lopez* prohibited simple possession of a gun near a school. *Terry*, 101 F.3d at 1418. *See also Dinwiddie*, 76 F.3d at 921 ("unlike the Gun–Free School Zones Act, FACE prohibits interference with a commercial activity—the provision and receipt of reproductive-health services"); *Wilson*, 73 F.3d at 683 (same); *Cheffer*, 55 F.3d at 1520 (same).

In addition, the connection between the Gun–Free School Zones Act and interstate commerce was an attenuated one based on several multi-step analyses linking gun possession to crime and to adverse effects on the educational process, which in turn (according to the government in *Lopez*) affect interstate commerce. With FACE, however, "the chain connecting the prohibited activity and interstate commerce contains only one link: violent and obstructive activity outside abortion clinics adversely affects interstate commerce

in reproductive health services." *Terry*, 101 F.3d at 1418. Thus, "FACE does not require [courts] to 'pile inference upon inference' to conclude that the conduct that it proscribes affects interstate commerce." *Dinwiddie*, 76 F.3d at 921. Moreover, since Congress made extensive factual findings regarding the interstate nature of the activities covered by FACE (which were lacking in *Lopez* ), "the courts are not left to imagine—as in *Lopez*—how the regulated activities affect interstate commerce." *Wilson*, 73 F.3d at 684. Furthermore, while *Lopez* is indisputably a significant case, it did not overturn prior Supreme Court case law holding that Congress has the power to regulate conduct that reduces interstate commerce in a good or service. *Dinwiddie*, 76 F.3d at 921. *See also United States v. Scott*, 919 F.Supp. 76, 78–79 (D.Conn.1996) ("[t]he *Lopez* Court did not overturn any Commerce Clause precedent; rather, the Court characterized its decision as a refusal to expand the Congress's Commerce Clause power, not as a departure from its Commerce Clause jurisprudence") (citing *Lopez*, —— U.S. at ——, 115 S.Ct. at 1634). "Therefore, *Lopez* notwithstanding, FACE is a valid exercise of Congress's power to regulate activity that substantially affects interstate commerce." *Dinwiddie*, 76 F.3d at 921.

There is also no support for defendant's contention that FACE exceeds Congress's authority to regulate interstate commerce because FACE regulates a non-economic, non-commercial activity, *i.e.*, anti-abortion protests. As the District of Columbia Circuit explained in *Terry*, "Congress has authority to regulate '*activities* that substantially affect interstate commerce,' " and "[t]he regulated activity—in this case, interfering with abortion clinics—need not be commercial, so long as its effect on interstate commerce is substantial." 101 F.3d at 1417 (quoting *Lopez*, 515 U.S. at ——, 115 S.Ct. at 1630) (alteration in original). *See also Wilson*, 73 F.3d at 684 ("[t]here is no authority for the proposition that Congress's power extends only to the regulation of commercial entities").

In short, it is clear that FACE "is a statute that really does seek to remove a significant obstruction, in rather a literal sense, to the free movement of persons and goods across state lines." *Soderna*, 82 F.3d at 1373. The Act therefore "falls well within Congress's Commerce Clause power to regulate activities that substantially affect interstate commerce." *Wilson*, 73 F.3d at 683.

## CONCLUSION

Defendant Norman Weslin's motion to dismiss the information (Item 20) is denied.

IT IS SO ORDERED.