**UNITED STATES of America,**

v.

**Norman WESLIN, Defendant.**

**No. 01–CR–002A.**

United States District Court, W.D. New York.

July 18, 2001.

John J. Molloy, West Seneca, NY, for norman Weslin.

Paul J. Campana, U.S. Atty., Buffalo, NY, for U.S.

### DECISION AND ORDER

ARCARA, District Judge.

### *INTRODUCTION*

On January 17, 2001, the government commenced the instant criminal contempt proceeding against defendant Norman Weslin by the filing of a four-count Infor-

mation. The Information charges that on September 9, September 16, September 23 and October 21, 2000, defendant Weslin committed criminal contempt, in violation of 18 U.S.C. § 401(3), by violating a preliminary injunction issued by this Court on July 26, 2000, in the underlying civil action *People of the State of New York, by Eliot Spitzer, Attorney General of the State of New York, et al. v. Operation Rescue National, et al.,* 69 F.Supp.2d 408 (W.D.N.Y.) (*"Spitzer"*). The Court's preliminary injunction prohibits defendant and others from engaging in certain conduct outside reproductive healthcare facilities located within the Western District of New York. The Information alleges that defendant violated the preliminary injunction on the dates specified in the Information by being present in a buffer zone established by the preliminary injunction outside the Buffalo GYN Womenservices reproductive healthcare facility.

Subsequent to the filing of the Information, the Court limited the possible sentence in this case to six-months' imprisonment or a $5,000 fine. A non-jury trial was held on May 1, 2001. Following the trial, the parties submitted proposed findings of fact and conclusions of law. Summations were held on June 11, 2001.

After considering the evidence adduced at trial, reviewing the submissions of the parties, and hearing summations from counsel, the Court finds defendant Weslin guilty beyond a reasonable doubt on each of the four counts in the Information. The following constitutes the Court's findings of fact and conclusions of law pursuant to Rule 23(c) of the Federal Rules of Criminal Procedure.

*FINDINGS OF FACT*

A. *Background of Spitzer Case, TRO and Preliminary Injunction*

On March 22, 1999, the plaintiffs in the *Spitzer* action, who include the People of the State of New York by Eliott Spitzer, Attorney General for the State of New York, several medical facilities and doctors who provide reproductive healthcare services, and organizations that advocate abortion rights, commenced that action by filing a complaint seeking relief under the Freedom of Access to Clinics Entrances Act ("FACE"), 18 U.S.C. § 248, and New York law.[1] Along with the complaint, the plaintiffs filed a motion for a temporary restraining order ("TRO") and a preliminary injunction, asking the Court to establish limited buffer zones around reproductive healthcare facilities located within this District and otherwise preventing the defendants from engaging in illegal activities designed to disrupt access to those facilities.

The defendant in the instant criminal contempt proceeding, Norman Weslin, is a named defendant in the *Spitzer* action. He is a Roman Catholic priest and has participated in numerous anti-abortion protests. He has been arrested numerous times throughout the United States for such activities. He estimated that he has been arrested between 60 and 70 times, with most of the arrests resulting in conviction, including a previous conviction for violating the FACE statute in this District. *See United States v. Weslin,* 964 F.Supp. 83 (W.D.N.Y.1997), *aff'd,* 156 F.3d 292 (2d Cir.1998), *cert. denied,* 525 U.S. 1071, 119 S.Ct. 804, 142 L.Ed.2d 665 (1999).

---

1. There is a detailed discussion of the background of the *Spitzer* case in the Court's Decision and Order filed July 26, 2000, regarding the preliminary injunction in that case. The Court hereby incorporates by reference that Decision and Order and assumes familiarity therewith.

One of the plaintiffs in the *Spitzer* case is Buffalo GYN Womenservices, Inc., a clinic at which reproductive healthcare services, including abortions, are provided. It is located at 2500 Main Street in Buffalo, New York. The clinic is on the west side of Main Street.

On April 8, 9 and 12, 1999, a hearing was held on the plaintiffs' motion for a TRO. At the hearing, defendant Weslin was represented by attorney Stasia Zoladz Vogel.

On April 15, 1999, the Court issued a TRO enjoining defendant and others from engaging in certain conduct outside reproductive healthcare facilities located within this District. Paragraph 2(A) of the TRO prohibited the defendant from "demonstrating, congregating, standing, sitting, lying down, posting or carrying signs, or being present in or on any portion of the sidewalk or curb on the west side of Main Street inside a buffer zone measured from 60 feet from the southern edge of the driveway entrance to the [Buffalo GYN Womenservices] facility and 58 feet from the northern edge of the building of the facility." Government Exhibit 2–A.

On or about June 17, 1999, defendant Weslin's attorney in the *Spitzer* case, Ms. Vogel, signed, on behalf of defendant, a "Stipulation & Order of Partial Settlement & Dismissal." This settlement document was signed by the Court on July 1, 1999, and filed on July 2, 1999. The settlement provided, in part:

> [T]he [S]ettling Defendants will continue to be bound by the terms of the T.R.O. ordered by the Court in this action unless and until any other injunction (a "superseding injunction") is issued by the Court in this action governing the same parties, which by its terms explicitly supersedes the T.R.O. or until the T.R.O. otherwise terminates; and

> [T]he Settling Defendants will be bound by the terms of any superseding or subsequent injunction ordered by the Court in this action governing the same parties, including any and all preliminary . . . injunctions . . . entered by the Court in this action . . . .

Government Exhibit 2–B.

On May 31, 2000, the plaintiffs in the *Spitzer* action applied for and were granted an Order to Show Cause for criminal and civil contempt against defendant Weslin. Plaintiffs' application for the Order to Show Cause alleged that on May 20, May 24, May 25, May 26, May 27 and May 31, 2000, defendant Weslin violated the Court's April 15, 1999 TRO by entering into the buffer zone in front of Buffalo GYN Womenservices, as described in paragraph 2(A) of the TRO. The application alleged that on each of those dates, defendant Weslin entered into the buffer zone, knelt down on the sidewalk in front of the clinic, prayed silently for approximately one hour, and then exited the buffer zone.[2]

On June 5, 2000, defendant Weslin appeared on the Order to Show Cause. At that time, plaintiffs' counsel informed the Court that defendant had also violated the TRO in a similar manner on June 1, 2000. The Court referred the matter to the Office of the United States Attorney for the Western District of New York for investigation and possible prosecution for criminal contempt. The Court also assigned attorney John Molloy to represent defendant Weslin in any criminal contempt proceeding brought against him by the government.

On June 26, 2000, the Court issued a preliminary injunction in the *Spitzer* case which, *inter alia,* regulated and prohibited

---

**2.** Plaintiffs also alleged that defendant Weslin violated the TRO in the same manner in front of a reproductive healthcare facility in Rochester, New York, on July 24, 1999.

certain conduct on and near the sidewalk in front of and adjacent to the premises of Buffalo GYN Womenservices. Paragraph 2(A) of the preliminary injunction prohibited defendant Weslin and others from "being present in or on any portion of the sidewalk or curb on the west side of Main Street inside a buffer zone measured from 60 feet from the southern edge of the driveway entrance to the [Buffalo GYN Womenservices] facility and 58 feet from the northern edge of the building of the facility." Government Exhibit 4. The locations and dimensions of the sidewalk buffer zone in front of Buffalo GYN Womenservices established by the preliminary injunction were the same as those established by the TRO. The preliminary injunction expressly superceded the TRO. Prior to the dates specified in the Information, defendant Weslin received notice and a copy of the preliminary injunction.

**B.** *September 9, 2000 Violation of the Preliminary Injunction*

On September 9, 2000, defendant Weslin entered the buffer zone in front of Buffalo GYN Womenservices, knelt on the sidewalk in front of the clinic, prayed for approximately 45 minutes, and then left. While he was praying inside the buffer zone, defendant Weslin was approached by the uniformed security guard for Buffalo GYN Womenservices who told him that he was violating the preliminary injunction and that he should walk back across Main Street. Defendant Weslin gave no response and continued praying inside the buffer zone.

Also during that time, defendant Weslin was approached by Officer Thomas Tully of the Buffalo Police Department, who was in uniform. Officer Tully told the defendant that he was violating a court order.

At trial, the government offered as exhibits several photographs taken on September 9, 2000, showing defendant Weslin inside the buffer zone in front of Buffalo GYN Womenservices. Government Exhibits 10–14.

**C.** *Declaratory Judgment Action in the Southern District of New York*

On September 12, 2000, defendant Weslin filed an action in the Southern District of New York seeking declaratory judgment against the Attorney General of the United States and the Attorney General of the State of New York. The two-page complaint alleges: (1) that on May 31, 2000, the New York State Attorney General moved this Court for civil and criminal contempt against defendant Weslin; (2) that on June 5, 2000, this Court referred the contempt motion to the United States Attorney for the Western District of New York for possible criminal prosecution for criminal contempt; (3) that as of the filing of the complaint, more than 90 days had elapsed without prosecution of the contempt; (4) that on September 9, 2000, defendant Weslin repeated the conduct which was the subject of the Attorney General's motion for contempt; and (5) that at all relevant times, defendant Weslin relied upon an 18–page legal opinion from attorney Gabriel P. Kralick, dated July 23, 1999.[3] The complaint asks that the court grant a declaratory judgment, declaring that defendant Weslin can continue to act in reliance upon the legal opinion dated July 23, 1999.[4]

---

**3.** The complaint does not state what the legal opinion is or how defendant Weslin relied on it.

**4.** No substantive action was taken on defendant Weslin's request for declaratory relief, and on January 24, 2001, the case was transferred to this Court.

### D. *September 16, 2000 Violation of the Preliminary Injunction*

On September 16, 2000, defendant Weslin entered the buffer zone in front of Buffalo GYN Womenservices, knelt on the sidewalk about eight feet in front of the clinic, prayed for approximately 35 to 45 minutes, and then left. While he was praying inside the buffer zone, defendant Weslin was approached by the uniformed security guard for Buffalo GYN Womenservices who told him that he was violating the preliminary injunction and that he should walk back across Main Street. Defendant Weslin responded only by holding a crucifix up to the officer's face.

At trial, the government offered as exhibits several photographs taken on September 16, 2000, showing defendant Weslin inside the buffer zone in front of Buffalo GYN Womenservices. Government Exhibits 20–24.

### E. *September 23, 2000 Violation of the Preliminary Injunction*

On September 23, 2000, defendant Weslin entered the buffer zone in front of Buffalo GYN Womenservices, knelt on the sidewalk in front of the clinic, prayed for approximately 40 minutes, and then left. While he was praying inside the buffer zone, defendant Weslin was approached by the uniformed security guard for Buffalo GYN Womenservices who told him that he was violating the preliminary injunction and that he should walk back across Main Street. Defendant Weslin gave no response and continued praying inside the buffer zone.

As defendant Weslin knelt on the sidewalk in front of the clinic, Buffalo Police Officer Tully drove his marked Buffalo Police cruiser onto a sidewalk to a place between the defendant and the clinic wall. Officer Tully opened the driver's side window and told the defendant that he was within the buffer zone in violation of the federal court order and that he should leave. Defendant did not respond.

At trial, the government offered as exhibits several photographs taken on September 23, 2000, showing defendant Weslin inside the buffer zone in front of Buffalo GYN Womenservices. Government Exhibits 30–34.

### F. *October 21, 2000 Violation of the Preliminary Injunction*

On October 21, 2000, defendant Weslin entered the buffer zone in front of Buffalo GYN Womenservices, knelt on the sidewalk in front of the clinic, prayed for approximately 35 to 45 minutes, and then left. While he was praying inside the buffer zone, defendant Weslin was approached by the uniformed security guard for Buffalo GYN Womenservices who told him that he was violating the preliminary injunction and that he should walk back across Main Street. Defendant Weslin gave no response and continued praying inside the buffer zone.

During that time, defendant Weslin was also approached by Buffalo Police Officer Tully, who was in uniform. Officer Tully told the defendant that he was violating a court order.

At trial, the government offered as exhibits photographs taken on October 21, 2000, showing defendant Weslin inside the buffer zone in front of Buffalo GYN Womenservices. Government Exhibits 40–41.

### G. *General Findings*

From April 15, 1999 to October 21, 2000, defendant Weslin engaged in similar conduct at Buffalo GYN Womenservices on approximately 14 occasions. On each occasion, he knelt down on the sidewalk immediately in front of the clinic, within the buffer zone contained in either the TRO or the preliminary injunction, and prayed for an average of 35 to 45 minutes.

On each of these occasions, defendant was informed by the uniformed clinic security guard that he was violating the Court's injunction. On four occasions, once in May 2000, and three times in September and October 2000, Buffalo Police Officer Tully, always in uniform and once in a marked police car, observed the defendant in the prohibited buffer zone in front of the clinic and told him that he was violating the Court's order.

One of the times that defendant was kneeling in the buffer zone of the clinic was on June 1, 2000. On that occasion an investigator of the New York State Attorney General's Office served court papers upon the defendant. Defendant dropped the papers to the ground and kicked them into Main Street.

Contempt proceedings were initiated against defendant Weslin with regard to 11 of the 14 occasions that he was within the buffer zone in front of Buffalo GYN Womenservices.[5]

On the occasions when defendant Weslin knelt in front of the clinic on Saturday mornings, other anti-abortion protestors always congregated on the east side of Main Street, across the street from the clinic and outside the buffer zone.

### H. *Findings Regarding Reliance on Advice of Counsel Defense*

At trial, defendant Weslin testified that on July 23, 1999, after the Court issued the TRO in the civil case, he was given a written legal opinion by an attorney named Gabriel Kralick[6] in which attorney Kralick purportedly opined that Weslin could enter the buffer zone outside the clinic for the purpose of praying, without violating the TRO. No written copy of the legal opinion was produced at trial nor was attorney Kralick called as a witness. Although not clearly stated by defendant Weslin during his testimony, attorney Kralick's opinion that Weslin could enter the buffer zone for the purpose of praying was apparently based on an interpretation of the following language at page 16 of the TRO:

> [N]othing in this Order shall be construed to limit defendants and those acting in concert with them from exercising their legitimate rights under the First Amendment of the United States Constitution[.]

(hereinafter referred to as the "First Amendment Provision").[7]

Defendant Weslin testified that his actions outside the Buffalo GYN Womenservices clinic on the dates specified in the Information were based on the July 23, 1999 legal opinion. He testified that because his conduct, *i.e.,* praying on the public sidewalk in front of the clinic, is the type of conduct protected by the First Amendment, such conduct was allowable under the TRO.

As stated above, the preliminary injunction in the civil case was issued on July 26, 2000, over a year after both the TRO and attorney Kralick's alleged legal opinion regarding the TRO. The preliminary injunc-

---

5. On June 11, 2001, the Court received a letter from the United States Attorney's Office, informing the Court that in light of the instant contempt prosecution for violations of the preliminary injunction, the government will not proceed with contempt charges against defendant Weslin for violations of the TRO.

6. Attorney Kralick appeared in the *Spitzer* case on behalf of another defendant. That defendant was voluntarily dismissed from the case by the plaintiffs on April 29, 1999. Attorney Kralick made no other appearances and never represented defendant Weslin in the *Spitzer* case.

7. The Court notes that the language in the First Amendment Provision tracks similar language in the FACE statute. *See* 18 U.S.C. § 248(d)(1).

tion contains a similar First Amendment Provision, except that in the preliminary injunction, this Provision contains the preface shown below in italics:

> *[E]xcept as set forth herein,* nothing in this Order shall be construed to limit defendants and those acting in concert with them from exercising their legitimate rights under the First Amendment of the United States Constitution[.]

(emphasis added).

Defendant Weslin did not seek or receive a legal opinion as to the meaning of the preliminary injunction and the effect, if any, that the aforementioned prefatory language might have had upon attorney Kralick's legal opinion regarding the TRO. Instead, defendant Weslin simply continued to rely on attorney Kralick's earlier opinion.

Although Mr. Molloy was assigned by the Court in June of 2000, three months before the first alleged violation in the Information, to represent defendant Weslin in any criminal contempt proceedings the government might bring against him, Weslin never asked Mr. Molloy for an opinion as to whether his conduct violated either the TRO or the preliminary injunction. Nor did defendant Weslin ever seek such an opinion from his original attorney, Ms. Vogel, through whom he had agreed to be bound by the TRO and any order that superceded it.

### I. *Defendant Weslin Acted Knowingly and Wilfully*

The Court finds as a matter of fact that defendant Weslin knowingly and wilfully violated the Court's preliminary injunction on each of the dates specified in the Information. Defendant's claim that he believed his conduct was permissible under the preliminary injunction is disingenuous. As discussed in more detail below, his interpretation of the First Amendment Provision is so unreasonable and illogical

that he could not have possibly believed it to be correct. Simply put, defendant knew full well that he was prohibited from being inside the buffer zone for any reason. Nevertheless, he set out to test the injunction, along with the resolve of the plaintiffs and the Court, and is asserting his spurious interpretation of the First Amendment Provision as a possible means to avoid punishment for his contemptuous conduct.

Further, it is evident from defendant Weslin's testimony at trial that he had no intention of obeying the Court's preliminary injunction. He described his presence on the sidewalk in front of Buffalo GYN Womenservices as opposition to killing, including abortion, which he equates with the killing of children. He further explained that he, and those who believe as he does, "follow God's law on this, we don't follow any manmade law. We wouldn't follow law of this Court, for any reason at all, if it conflicted with God's law." Trial Transcript ("Tr.") at 101. His myriad arrests and convictions resulting from his anti-abortion protest activities further reflect this attitude. He clearly does not feel bound to comply with any type of statute or court order which might interfere with his anti-abortion protest activities.

### CONCLUSIONS OF LAW

#### A. *Law of Contempt*

The purpose of providing the United States courts with the authority to punish disobedience or resistance to their lawful orders is to vindicate the authority of the courts and to protect the courts in the conduct of their business. The foundation of the criminal contempt power is the need to protect the judicial process from wilful impositions, particularly those designed to obstruct the normal machinery of justice. Sand, Siffert, Loughlin & Reiss, *Modern Federal Jury Instructions,* Instruction No. 20–11.

In order to sustain its burden of proving the charge of contempt, the government must establish beyond a reasonable doubt each of the following elements: (1) that the Court issued a preliminary injunction prohibiting the defendant from engaging in certain conduct; (2) that the defendant disobeyed or disregarded the preliminary injunction; and (3) that the defendant acted knowingly and wilfully. *See id.* at Instruction No. 20–12.

The first element of the offense of contempt is that the Court issued an order that applied to defendant. For the order to be enforceable by criminal contempt, it must be clear and definite. If the evidence shows that the Court clearly and definitely ordered the defendant not to conduct himself as charged in the Information, then the first element of the offense is satisfied. *Id.* at Instruction No. 20–13.

The second element of the offense is that the defendant disobeyed or disregarded the Court's order. Court orders must be precisely and promptly obeyed. If the evidence establishes that the defendant failed to comply with the preliminary injunction's prohibition against him being present within the buffer zone in front of Buffalo GYN Womenservices, then the second element of the offense is satisfied. *Id.* at Instruction No. 20–14.

The third element of the offense of contempt is that defendant acted knowingly and wilfully. Contempt means a willful disregard or disobedience of public authority. In order to find a defendant guilty of contempt, the evidence must establish that defendant acted knowingly and with the specific intent to disregard or disobey the order of the court. A person acts knowingly if he acts intentionally and voluntarily and not because of ignorance, accident, mistake, or carelessness. If the defendant understood the preliminary injunction and consciously refused to obey that order,

then the defendant acted knowingly and wilfully. *Id.* at Instruction No. 20–15.

Good faith is a defense to the offense of contempt only when the defendant has made a reasonable effort to comply with the court order but has failed because of the indefiniteness of the order or some other inability to do so. It is not a defense when the defendant has refused to comply with the order he is charged with violating. *Id.* at Instruction No. 20–17.

■ Good faith reliance on advice of counsel is not a defense to a charge of criminal contempt, though it may be considered as a mitigating factor in the punishment to be imposed in the event of conviction. *United States v. Remini,* 967 F.2d 754, 757 (2d Cir.1992).

### B. *Application of the Law to the Facts*

Defendant Weslin does not dispute: (1) that the preliminary injunction was in full force and effect on the dates charged in the Information; (2) that he had notice of the preliminary injunction prior to the dates charged in the Information; (3) that he was bound by the preliminary injunction through the stipulation filed July 2, 1999; and (4) that on each of the dates charged in the Information he was, in fact, present in the buffer zone in front of Buffalo GYN Womenservices, in violation of paragraph 2(A) of the preliminary injunction.

Defendant appears to be asserting two separate but related defenses. Both defenses go to the issue of wilfulness. First, he claims that on the dates in question, he had a good faith belief that his actions did not violate the preliminary injunction. Second, he claims that he relied in good faith on the legal opinion given him on July 23, 1999, stating that his conduct would not violate the TRO. The Court finds these defenses without merit.

## 1. *Good Faith Defense*

■ Defendant asserts that he had a good faith belief that his conduct did not violate the preliminary injunction. This belief, he states, is based on the First Amendment Provision of the preliminary injunction, which, as previously stated, provides:

> [E]xcept as set forth herein, nothing in this Order shall be construed to limit defendants and those acting in concert with them from exercising their legitimate rights under the First Amendment of the United States Constitution[.]

Based on this language, defendant asserts that he believed his actions, *i.e.*, praying within the buffer zone, did not violate the preliminary injunction. Such an interpretation of the preliminary injunction, however, is so unreasonable and illogical that any claim by defendant that he actually believed, in good faith, that he was not violating the preliminary injunction based on this interpretation is not credible. Paragraph 2(A) of the preliminary injunction clearly and unequivocally prohibited defendant from "being present in" the buffer zone in front of Buffalo GYN Womenservices. The only reasonable and logical way to interpret the First Amendment Provision without eviscerating the entire intent of the injunction, and paragraph 2(A) in particular, is that the First Amendment Provision applied to defendant's activities *outside* of the buffer zone. It makes no sense to interpret the order to mean that the defendants were prohibited from "being present in" the buffer zone, yet at the same time could enter the buffer zone to exercise their First Amendment rights. Indeed, if defendant's interpretation of the First Amendment Provision were correct, it would mean that he and the other defendants were also free to enter the buffer zone for the purpose of demonstrating and carrying signs, activities normally protected by the First Amendment. Such conduct, however, is expressly prohibited under paragraph 2(A) of the preliminary injunction.[8] Thus, the Court rejects defendant's contention that he had a good faith belief that he was complying with the Court's preliminary injunction.

Defendant's lack of good faith is also manifest in several other ways. First, despite being repeatedly warned by the clinic security guard and Buffalo Police Officer Tully that he was violating the injunction, and despite the Court having referred several previous possible violations to the United States Attorney's Office for investigation and possible prosecution for contempt, defendant Weslin never moved the Court for any clarification of or change to the preliminary injunction, and continued his conduct unabated.[9]

Second, defendant's lack of good faith is also manifest by the fact that after filing his declaratory judgment in the Southern

8. The Court notes that in the First Amendment Provision in the preliminary injunction, it added the words "except as set forth herein" as a preface to the Provision. Such prefatory language was not included in the TRO. However, even without the preface, an interpretation of the First Amendment Provision that would allow the defendants to enter the buffer zones for the purpose of exercising their First Amendment rights would run so clearly contrary to the other provisions of the injunction that such an interpretation could not be relied upon in good faith.

9. Defendant also mentioned during his testimony that he thought his conduct was acceptable because he was never "arrested" for it. Tr. at 92–93. However, both the TRO and preliminary injunction stated that they were enforceable "by a motion for criminal and/or civil contempt." There was no provision in either the TRO or preliminary injunction that authorized any law enforcement agency to "arrest" defendant for violating the order.

District, he continued the same course of conduct without waiting for a ruling from the court. The declaratory judgment action was filed on September 12, 2000, yet defendant continued to participate in the same conduct on September 16, September 23 and October 21, 2000.

Finally, as discussed above in the Findings of Fact, it is clear from defendant's testimony and his numerous prior arrests and convictions for anti-abortion protest activities that he had no intention of complying with the Court's order.

### 2. *Good Faith Reliance on Advice of Counsel Defense*

■ Defendant further contends that he cannot be held to have wilfully violated the preliminary injunction because he relied in good faith on the July 23, 1999 legal opinion of attorney Kralick. The Court finds this defense without merit.

As stated above, the Second Circuit has held that good faith reliance on advice of counsel is not a defense to criminal contempt. *See Remini*, 967 F.2d at 757. Further, the legal opinion upon which defendant relies was rendered with regard to the TRO, not the preliminary injunction. Defendant made no attempt to seek a legal opinion as to the meaning of the preliminary injunction and the effect, if any, that the prefatory language added to the First Amendment Provision might have had on counsel's opinion.

### CONCLUSION

Based upon the evidence presented at trial, and for the reasons stated herein, the Court finds beyond a reasonable doubt that on September 9, September 16, September 23 and October 21, 2000, defendant Norman Weslin knowingly and wilfully disobeyed the preliminary injunction issued by this Court on July 26, 2000, by being present in the buffer zone in front of the Buffalo GYN Womenservices, in violation of paragraph 2(A) of the preliminary injunction and 18 U.S.C. § 401(3). Accordingly, the Court finds defendant Normal Weslin guilty on Counts One through Four of the Information.

Sentencing shall be held on October 18, 2001 at 12:30 p.m. The initial presentence report shall be completed by September 3, 2001. The parties' Statements with Respect to Sentencing Factors and/or objections and motions shall be filed by September 24, 2001. Responses to any objections and motions shall be filed by October 4, 2001. The final presentence report shall be completed by October 11, 2001. Letters in support of the defendant and/or sentencing memoranda shall be submitted to the Court's chambers by October 15, 2001. The United States Probation Office shall be provided with a copy of all submissions.

IT IS SO ORDERED.